## UNITED STATES v. NORTH AMERICAN OIL CONSOLIDATED et al.

(District Court, S. D. California.   June 8, 1917.)

### No. A–18.

1. MINES AND MINERALS ⬤⇒2—PUBLIC LANDS—WITHDRAWAL—RIGHTS OF OCCUPANTS.

To bring an occupant or claimant of oil or gas lands within Pickett Act June 25, 1910, c. 421, § 2. 36 Stat. 847 (Comp. St. 1916, § 4524), providing that the rights of any person who at the date of any withdrawal order is a bona fide occupant or claimant of oil or gas lands, and who at such date is in diligent prosecution of work leading to the discovery of oil or gas, shall not be affected by such order, it is not necessary that such occupant be engaged in actual drilling for oil or gas on a particular tract at the date of withdrawal, or necessarily that work is then being performed upon the identical claim upon which discovery must ultimately be made in order to make location, and it is enough if reasonable effort is being made at that time, indicating a bona fide intention to complete the work of discovery on the particular claim with all practical expedition; such intention being manifested by the doing of physical acts having a direct tendency to facilitate the exploration for and discovery of oil or gas.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 2.]

2. MINES AND MINERALS ⬤⇒2—PUBLIC LANDS—WITHDRAWAL—RIGHTS OF OCCUPANTS.

A company which for months before the date of a presidential order withdrawing oil and gas lands from entry, and at the date thereof was engaged in work necessary and proper in order to effect a discovery of oil, with the then present bona fide purpose of completing such work with all reasonable expedition, was diligently prosecuting the work, so as to be within the protection of the Pickett Act, though it was delaying the installation of its machinery and the commencement of drilling until it could be assured of a supply of water necessary for the prosecution of the drilling: the land being in a semiarid region.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 2.]

3. MINES AND MINERALS ⬤⇒2—PUBLIC LANDS—WITHDRAWAL—RIGHTS OF OCCUPANTS.

Such company was not required to make any unusual or extraordinary effort to obtain water, but only such as was reasonable under the circumstances confronting it.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 2.]

4. MINES AND MINERALS ⬤⇒2—PUBLIC LANDS—WITHDRAWAL—RIGHTS OF OCCUPANTS.

Under the Pickett Act, where an oil company was in diligent prosecution of work leading to discovery of oil at the date the land was withdrawn from entry, and never abandoned or intended to abandon the property, but remained in possession, proceeding with the work of development in good faith, with more or less diligence, until the actual discovery of oil, it was too late for the government, after discoveries had been made at a large expense, to question its rights on the ground that at some time during the progress of the work, subsequent to the withdrawal and prior to discovery, it was not as diligent as it could have been.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 2.]

5. MINES AND MINERALS ⬤⇒2—PUBLIC LANDS—WITHDRAWAL—RIGHTS OF OCCUPANTS.

The Pickett Act, providing that the rights of a bona fide occupant of oil or gas lands, who at the date of any withdrawal order is in diligent

prosecution of work leading to discovery of oil or gas, shall not be affected or impaired by such order so long as such occupant or claimant shall continue in diligent prosecution of such work, does not mean that the occupant's rights shall no longer continue after a discovery is made and the work leading to discovery ceases, but means that the occupant shall have a right to continue his work to a discovery, and the benefits of the discovery as if the land had not been withdrawn.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 2.]

6. STATUTES ⬤➡183—CONSTRUCTION—SPIRIT OR LETTER OF LAW.
It is the duty of the court to search out the true meaning of a law, and to permit the spirit and reason to prevail over the letter.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 261.]

In Equity. Suit by the United States against the North American Oil Consolidated and others. Bill dismissed.

Frank Hall, Sp. Asst. Atty. Gen., of San Francisco, Cal., for the United States.

Chas. S. Wheeler and A. L. Weil, both of San Francisco, Cal., for defendants North American Oil Consolidated and others.

D. S. Ewing, of Fresno, Cal., for defendant Frick.

Andrews, Toland & Andrews, of Los Angeles, Cal., for defendant Union Oil Co. of California and Producers' Transp. Co.

J. Delmore Lederman, of San Francisco, Cal., for defendant Pioneer Midway Oil Co.

BEAN, District Judge (sitting by special assignment). This is a suit by the government to oust the defendants from the possession of section 2, township 32 south, range 23 east, M. D. M., oil-bearing lands in the state of California, and require them to account for and pay over to it the value of oil taken therefrom. The legal title to the land is in the United States. It is included within the area described in the presidential withdrawal order of September 27, 1909. No discovery of oil had been made on any part of the premises at the date of such order. The Pioneer Midway Oil Company was in possession thereof at the time, and it is claimed was in diligent prosecution of work leading to discovery of oil; hence it is said that the land was, by the terms of the order, excluded therefrom because it was "a location or claim existing and valid" at its date; but, if this is not so, the oil company and its successors in interest have a right to retain possession and extract the oil under the proviso of the act of Congress of June, 1910, commonly known as the Pickett Act, which reads:

"That the rights of any person who, at the date of any withdrawal order heretofore or hereafter made, is a bona fide occupant or claimant of oil or gas bearing lands, and, who at such date is in diligent prosecution of work leading to discovery of oil or gas, shall not be affected or impaired by such order so long as such occupant or claimant shall continue in diligent prosecution of said work." 36 Stat. 847.

In view of the conclusions I have reached on the second question, it is not necessary to consider the first. That the Pioneer Midway Oil Company was an actual bona fide occupant and claimant of the property at the date of the withdrawal order, for the purpose of acquiring

title under the mining laws, is clear; but the position of the government is that it was not then in diligent prosecution of work leading to discovery, within the meaning of the Pickett Act.

There is but little if any dispute about the material facts. In January, 1907, while the land in controversy was public land of the United States, subject to entry under the mining laws, Mr. Strasberger and his associates, all of whom were qualified entrymen, acting in good faith, posted notices on each quarter section thereof and had such notices recorded in the proper county, claiming the same under the placer mining laws. In August of that year they conveyed or transferred their interests to the Pioneer Midway Oil Company, and late in 1908 or early in 1909 the oil company, intending to explore the property for the discovery of oil as soon as practicable, went into possession of the four claims. It thereupon purchased the necessary material and caused to be constructed on each claim a derrick and a building or buildings for the housing and accommodation of its employés. The buildings so erected were designed and intended for use in the development and operation of the entire section, and were such as were common in the oil fields, and necessary and proper for that purpose. The derricks were substantial structures, designed and subsequently actually used for drilling.

By the end of June, 1909, these improvements were practically completed, except the hanging of the tools and setting the boilers. Two boilers (all that were available in the community) had been purchased and transported to the property, but not set up. Thereafter up to and at the time of the withdrawal order employés of the oil company were on each quarter section as keepers digging cellars, clearing up sage brush, and doing other preparatory work. Tools had not been hung in the derricks or the boilers set up because the oil company had been unable to obtain assurance of an adequate supply of water for boiler and drilling purposes. The land in controversy is in a semiarid section of the country and at the time of the withdrawal order water was secured with great difficulty. Large quantities of water are required to drill an oil well and a dependable supply is necessary not only for use in the boilers, but in the well itself for drilling, and to prevent the walls from caving and the casing freezing. It costs from $25,000 to $50,000 on an average to sink a well in the territory in question, and it would be imprudent to begin drilling without an adequate supply of water to enable the work to proceed continuously; otherwise the well would probably be lost and the expenditures be for naught.

Attempts had been made without success to develop water on the land in question, and it had to be brought from a distance. The only available sources were the Stratton Water Company, and a plant belonging to the Santa Fé, semipublic service concerns, and transportation by rail from Bakersfield, a distance of 50 or 60 miles. None of these sources was dependable, and none had any surplus to sell, or would guarantee any definite supply of water to its customers. Neither the Stratton Water Company nor the Santa Fé had piped water to a point nearer than several miles to the land in question. The Stratton Company had more customers connected with its plant than it could sup-

ply, the Santa Fé Company was not then selling water for drilling purposes, and transportation by rail from Bakersfield was irregular, uncertain, and inadequate. The Stratton Water Company and the Santa Fé people, however, were engaged in enlarging their plants by sinking new wells, laying additional mains, and installing new machinery, and held out the reasonable hope and promise that they would soon be able to furnish an adequate supply of water. For these reasons, the oil company did not commence drilling, although intending to do so as soon as water could be secured, but remained in possession of each quarter section with keepers or watchmen in charge, and employés doing more or less work, until March, 1910, when it disposed of its interests to Laymance and his associates, referred to as "No. 2 Syndicate."

About this time, the Stratton Water Company had enlarged its plant and increased its facilities by installing additional machinery and bringing in another well, and soon after the purchase by No. 2 Syndicate a water line was laid from its plant to the property, the derricks previously built by the oil company rigged up, and drilling actually begun on the southeast quarter on May 4, 1910, the southwest quarter June 20, 1910, the northwest quarter July 25, 1910, and the northeast quarter September 5, 1910, since which time and prior to the commencement of this suit numerous wells have been drilled and oil in commercial quantities discovered on each quarter section.

The Pioneer Midway Oil Company expended while in the possession of the property, in the erection of buildings, derricks, and the like, about $10,000, and there has been expended by its successors in interest, in sinking wells and developing the property, more than half a million dollars. The question for decision is whether these facts show the oil company to have been in diligent prosecution of work leading to discovery on the several claims at the date of the withdrawal order, within the meaning of the Pickett Act.

A statement in general terms of the conditions applicable to all cases arising under this act, and which should govern in determining whether the requisite diligence existed, is difficult, if not impossible. What constitutes diligent prosecution of work does not lend itself to exact definition. Diligence is a relative term, and what is due diligence in a given case must be determined by the circumstances. Chief Justice Lewis, in Mining Co. v. Carpenter, 4 Nev. 546, 97 Am. Dec. 550, says:

That it "is that constancy or steadiness of purpose which is usual with men engaged in like enterprises; * * * such assiduity in the prosecution of the enterprise as will manifest to the world a bona fide intention to complete it within a reasonable time. It is the doing of an act, or series of acts, with all practicable expedition, with no delay, except such as may be incident to the work itself," and that "the law does not require any unusual or extraordinary effort but only that which is usual, ordinary, and reasonable."

And the Supreme Court of California, in McLemore v. Express Co., 158 Cal. 559, 112 Pac. 59, 139 Am. St. Rep. 147, says that diligent prosecution of the work of discovery on an oil mining claim—

"does not mean the doing of assessment work. It does not mean the pursuit of capital to prosecute the work. It does not mean any attempted holding by

cabin, lumber pile, or unused derrick. It means the diligent, continuous prosecution of the work, with the expenditure of whatever money may be necessary to the end in view."

[1] To bring an occupant or claimant of oil or gas bearing lands within the provisions of the Pickett Act, it is not necessary that he was engaged in actual drilling for oil or gas on a particular tract at the date of withdrawal (U. S. v. Grass Creek O. & G. Co., 236 Fed. 481, 149 C. C. A. 533), or necessarily that work was then being performed upon the identical claim upon which discovery must ultimately be made in order to make location. It is enough if reasonable effort was being made at that time, indicating a bona fide intention to complete the work of discovery on the particular claim with all practical expedition; such intention being manifested by the doing of physical act or acts which had a direct tendency to facilitate the exploration for and discovery of oil or gas thereon, although drilling had not commenced and the work may not have been on such claim. Smelting Co. v. Kemp, 104 U. S. 636, 26 L. Ed. 875; U. S. v. Thirty-Two Oil Co. (D. C.) 242 Fed. 730, just decided; U. S. v. Ohio Oil Co. (D. C.) 240 Fed. 996.

[2, 3] Diligent prosecution of work leading to discovery upon a mining claim depends so largely upon the physical conditions of the locality, the nature and situation of the region, its accessibility, the magnitude of the work, the difficulty of securing material and supplies, and the like, that each case must rest largely on its own facts and circumstances, and a decision in one is of but little assistance in another. Since, however, the law does not require any unusual or extraordinary effort, but only that which is usual, ordinary, and reasonable under the circumstances, I am of the opinion that the oil company was in diligent prosecution of work leading to discovery at the date of the withdrawal, within the meaning of the Pickett Act. It was when overtaken by the withdrawal, and for months before had been, in occupation of each claim, engaged in work necessary and proper in order to effect a discovery thereon, with the then present bona fide purpose of completing such work with all reasonable expedition, and was at the date of the withdrawal doing all that could reasonably and justly be expected of it under the circumstances. The law does not require a vain or useless thing to be done, and therefore the oil company was not required by the law of diligence to have installed all its machinery or commenced drilling before its supply of water was such that it could reasonably hope to successfully continue the work. Nor was it required to make any unusual or extraordinary effort to obtain water, but only such as was reasonable under the circumstances confronting it. Its possession, the work which it had done and was then doing, were such that it would have been protected by the courts from intrusion by private parties if the order had not been made. Cosmos v. Eagle Hill, 112 Fed. 4, 50 C. C. A. 79, 61 L. R. A. 230; McLemore v. Express, 158 Cal. 559, 112 Pac. 59, 139 Am. St. Rep. 147; Miller v. Chrisman, 140 Cal. 440, 73 Pac. 1083, 74 Pac. 444, 98 Am. St. Rep. 63; Chrisman v. Miller, 197 U. S. 313, 25 Sup. Ct. 468, 49 L. Ed. 770; Borgwardt v. McKittrick Oil,

164 Cal. 650, 130 Pac. 417; Rooney v. Barnette, 200 Fed. 700, 119 C. C. A. 116. And that, I take it, is the true test in cases of this character.

[4-6] It is contended, however, on behalf of the government, that even if the oil company was in diligent prosecution of work leading to discovery at the date of the withdrawal, such diligence was not continuous thereafter. I do not think it necessary to carefully weigh the testimony on that point. The evidence shows that the Oil Company and its successors in interest never abandoned, nor intended to abandon, the property, but remained in possession, proceeding with the work of development in good faith, with more or less diligence, until the actual discovery of oil. Discoveries had been made and oil developed on each claim prior to the commencement of these suits, at an aggregate expense of more than half a million dollars, and it is now too late, in my opinion, for the government to question the defendants' right to the possession and to the oil contents because it may be that at some time during the progress of their work, since the withdrawal and prior to discovery, they were not as diligent as they could have been. It is true the Pickett Act provides that the right of a bona fide occupant or claimant at the date of a withdrawal order, and who was at such time in diligent prosecution of "work leading to discovery," shall not be impaired or affected so long as such occupant or claimant shall continue in diligent prosecution of "said work" referring logically to work leading to discovery, thus implying that when discovery is made his right shall no longer continue. It cannot be supposed, however, that Congress intended any such result. The duty therefore devolves upon the court to search out the true meaning of the law, and to permit the spirit and reason to prevail over the letter. U. S. v. Mulvey, 232 Fed. 513, 146 C. C. A. 471; Holy Trinity v. U. S., 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226. And, so construed, it conferred upon an occupant or claimant of withdrawn land, who is within its provisions, the right to continue his work to a discovery, and the benefit thereof, as if the land had not been withdrawn, with the same right in the government to re-enter, if the diligence was not continuous, as a private citizen would have had if the land had not been withdrawn.

The history of this and subsequent legislation, it seems to me, confirms this view. See Act March 2, 1911, c. 201, 36 Stat. 1015 (Comp. St. 1916, § 4637). Anomalous as it may seem, public land containing petroleum or other mineral oil and chiefly valuable therefor could, at date of withdrawal order, have been entered and patent obtained only under the placer mining law. Act Feb. 13, 1897, c. 221, 29 Stat. 526 (Comp. St. 1916, § 2497). No location of a placer claim, valid against the government, could have been made until the discovery of mineral within the limits of the claim. R. S. §§ 2320–2329 (Comp. St. 1916, §§ 4615–4628). Hence there could have been no such location of an oil claim until the discovery of oil. The oil measures in the district in question, however, lie far below the surface, often 3,000 or 4,000 feet, and can be reached only by great labor and expense. The installation of elaborate and expensive machinery, months of time, and

the outlay of many thousands of dollars were therefore required before a valid location could be made.  There was no law, state or national, at the time of the withdrawal, authorizing or requiring the marking of boundaries of mining locations, or the posting and recording notice of an intention to locate a mining claim prior to discovery, or declaring the effect of such notice or the failure to give it.  In view of the conditions, however, and the necessities of the case, a practice had grown up to mark the boundaries and post on the land and record in a public office a so-called notice of location, which operated by common consent as a manifestation of a purpose on the part of the parties named therein to claim the land within the prescribed boundaries, and gave to them or their assignees a preference right to the possession.  This right had been recognized by the local courts as transferable, and the possession of a bona fide occupant or claimant holding under such location was protected against all forms of forcible or clandestine entry or intrusion by third parties, while he was in good faith diligently engaged in work leading to discovery, in order that he might make discovery, which, when made, would relate back to date of notice.  McLemore v. Express, supra; Miller v. Chrisman, supra; Borgwardt v. McKittrick, supra; Rooney v. Barnette, supra.

This situation was called to the attention of Congress, and it was represented to it that at the time of the withdrawal of September, 1909, which came without notice and without giving interested parties an opportunity to be heard, land within the withdrawn area in California was thus occupied by persons and corporations who were in good faith engaged in the actual work of exploration, with the bona fide intention of complying with the mining laws, but had not yet discovered oil.  There was no statutory law protecting such an explorer against the government, or giving him any vested right against it, even that of occupation, although he was in possession by its invitation and under its promise, implied, if not expressed, to permit him to retain possession and acquire the benefits of a discovery, if it should be subsequently made.  R. S. 2319–2325 (Comp. St. 1916, §§ 4614–4622).  For the government, under these circumstances, to have summarily dispossessed and ousted such occupants or claimants, confiscating the results of their labor and improvements, would have been a great hardship, if not a positive wrong.  It was recognized that if the withdrawal order was valid (a question then undetermined) the interests of such parties were probably destroyed and their expenditures lost, unless relief was afforded; and hence Congress, in recognition and confirmation of their rights, as recognized by the local laws, and the moral obligation of the government, inserted the proviso in the act of June, 1910, for their benefit, and in view of the existing conditions made known to it at the time.

It is remedial legislation, and should be construed to carry out the intention of Congress.  Whether it was intended to reward an occupant or claimant engaged in the work of discovery at the date of a previous withdrawal, and who continued therein in defiance thereof, and penalize one so engaged, but who stopped his work out of regard for the order until he could lawfully proceed, or whether it was in-

tended to require continuous diligence after the passage of the Pickett Act, is not clear; but the question is not material, I take it, where the required diligence existed at the date of withdrawal, and there has been no subsequent abandonment of the claim, but possession retained and actual discovery made prior to re-entry by the government or the commencement of a ouster suit.

Bill will therefore be dismissed.