UNITED STATES v. HONOLULU CONSOL. OIL CO.

(District Court, S. D. California, N. D. March 2, 1918.)

No. B–46.

1. MINES AND MINERALS ⬤⟩2—OIL OR GAS BEARING LAND—WITHDRAWAL.—DILIGENT PROSECUTION OF WORK.

Under Pickett Act June 25, 1910, c. 421, 36 Stat. 847 (Comp St. 1916, §§ 4523–4525), declaring that rights of any person who at the date of any withdrawal order is a bona fide occupant or claimant of oil or gas bearing land, and who is in diligent prosecution of the work leading to discovery shall not be affected by the order, the drilling of an oil well on one location cannot, where the group theory was inapplicable to the several locations, be treated as work leading to discovery on another.

2. INJUNCTION ⬤⟩1—RECEIVERS ⬤⟩1—GRANTING—APPOINTMENT.

The granting of an injunction or the appointing of a receiver is ordinarily a harsh remedy, and such relief will only be granted in a clear case.

3. MINES AND MINERALS ⬤⟩38(7)—OIL AND GAS LANDS—INJUNCTION AND RECEIVER.

Where the question whether defendant, the occupant of oil and gas bearing lands, who sought patents therefor, was in diligent prosecution of work of discovery at time of presidential withdrawal, within Pickett Act June 25, 1910, c. 421, was debatable, particularly as it was uncertain whether the group theory was applicable, an injunction to restrain further drilling for oil on disputed claims, unless necessary for the protection of the property, should be granted, and a receiver appointed to take charge of the proceeds of oil from wells on the disputed claims, though the proceeds of such oil were practically impounded under defendant's present contract with an oil company, and defendant was solvent, for the contract might be changed, and defendant's assets dissipated.

In Equity. Suit by the United States against the Honolulu Consolidated Oil Company. Injunction granted, and receiver appointed.

Henry F. May and Frank Hall, Asst. U. S. Attys. Gen.

Morrison, Dunne & Brobeck, of San Francisco, Cal., for defendant.

RUDKIN, District Judge. The lands in controversy in this case are within the presidential withdrawal of September 27, 1909, and the rights of the parties depend largely upon the construction to be given the proviso to the so-called Pickett Act of June 25, 1910 (36 Stat. 847, c. 421 [Comp. St. 1916, §§ 4523–4525]), which reads as follows:

"The rights of any person who, at the date of any withdrawal order heretofore or hereafter made, is a bona fide occupant or claimant of oil or gas bearing lands, and who, at such date, is in diligent prosecution of work leading to the discovery of oil or gas, shall not be affected or impaired by such order, so long as such occupant or claimant shall continue in diligent prosecution of said work."

The material facts are these: For some considerable time before the presidential withdrawal order, the defendant, or its predecessor in interest, was the owner of a patented section of land in the vicinity of Taft and Maricopa, in the state of California, designated as section 10, also of another patented quarter section, and held by assignments

from the original locators 31 quarter sections surrounding and in the immediate vicinity of section 10; such locations having been made under the mineral land laws of the United States. When drilling operations actually commenced on patented section 10 does not appear from the records before me, but at all events work had so far progressed as early as June, 1909, that large quantities of gas were encountered in the drilling operations on that section. This caused a suspension of work for a time, but as soon as the gas was brought under control the drilling continued, and oil was actually discovered on February 1, 1910. It might be said in this connection that a disclaimer has been filed by the defendant as to 14 of the 31 quarter sections, so that on the present hearing we are only concerned with the remaining 17. During the year prior to the withdrawal order a cabin, or a skeleton derrick, or in some cases perhaps both, was constructed on each of these quarter sections, and the defendant had expended considerable sums in this way, and in the building of roads, making surveys, piping water from a distant lake, and otherwise providing for the general development of the property. In due time the defendant made application for patents, submitted its proofs, and final certificates issued, accompanied by a notation, however, that the government protested against the acceptance of the proofs or the issuance of patents. On two ex parte hearings thereafter the Commissioner of the General Land Office decided the controversies in favor of the defendant; but a hearing has since been ordered by the Commissioner for the purpose of inquiring into the rights of the respective parties, and the applications for patents are thus pending at the present time. The present suit was instituted by the government to enjoin the defendant from drilling further wells on the disputed tracts, and for the appointment of a receiver for the wells now in operation, until the matters are finally disposed of by the Land Department, and until patents issue or the applications for patents are finally rejected.

[1-3] The case hinges upon the true intent and meaning of the words "in diligent prosecution of work leading to discovery of oil or gas," and upon this question the decisions do not seem to be entirely harmonious. If the title to all these lands was vested in a common ownership, the testimony leaves no doubt in my mind that at the date of withdrawal the defendant was diligently engaged in the development of the entire group in a practical, businesslike, economic way, for it would not be the part of prudence to drill wells simultaneously on these 17 or 31 claims to a depth of from 2,000 to 4,000 feet before the oil-bearing quality of the lands was ascertained or proven. Indeed, such a course would seem to involve a profligate and useless waste of money. But the title to the unpatented lands was not vested in a common ownership, and the question arises: Can the group system of development be applied to such a case? If not, and if each of the several unpatented claims must be deemed a separate entity or a single unit for the purposes of development, a grave and doubtful question arises as to whether, on each individual claim, work leading to the discovery of oil or gas was in diligent prosecution on the date of withdrawal. I say the question is doubtful and debatable, because the testimony would warrant, though it would not impel, a finding that the

prosecution of further work on the unpatented claims was dependent entirely upon the results obtained or the conditions found in the drilling on section 10.

In reaching this conclusion I am not controlled by the provisions of the contract between the predecessor in interest of the defendant and his assignors, for by that contract Matson had an undoubted right to limit his obligation to any extent he saw fit, and the obligation of his contract would throw but little light on his future intentions. But there is other evidence in the record, and other inferences that may be drawn from undisputed facts. Under date of March 6, 1909, Matson, the predecessor in interest of the defendant, wrote to his agent, Crandall, as follows:

"Would it be practical to order the lumber for the rigs, without ordering the rig irons, as it runs into money, and I do not feel we should spend too much money until we are sure of getting oil there. We are still 'wild-catting,' and have spent considerable money up to date, and I do not want to dump in any more until there is surety of success. If you think it is absolutely necessary to order the lumber, why I think I will order it up here."

These views may have been somewhat modified by the later discovery of gas on section 10; but, however strong the indications of oil might then be, the discovery of gas is not the discovery of oil, and with my limited knowledge of the oil industry it seems incredible to me that the defendant would proceed to drill wells on these quarter sections, one after another, if neither oil nor indications of oil were discovered on section 10, or on the quarter sections previously drilled. For these reasons, as already stated, I am of opinion that the testimony would warrant a finding that future operations on the unpatented sections depended entirely upon the results obtained from the drilling on section 10. It must be understood that I am not holding or intimating that such a finding should be made, because that question rests entirely with another department of the government. I merely hold that the case presented is not entirely one-sided, as claimed, and that a finding either way would find its warrant in the record before me. We are then brought back to the question: Can the development work in progress on section 10 be held to be development work on the remaining quarter sections within the meaning of the law? In discussing this question in United States v. Thirty-Two Oil Co. (D. C.) 242 Fed. 723, 735, Judge Bean said:

"Now, it is clear from the testimony, and in fact undisputed, that there was no work in progress or immediately contemplated at the date of the withdrawal looking to discovery, or intended for the discovery, of oil thereon, and had not been for some months prior thereto, if at any time, unless the drilling of a well by the oil company on another location, half a mile distant, with the intention on its part, if oil was discovered thereon, to thereafter proceed with the development of the location in question, is held to be such work. Whether an occupant or claimant of oil or gas bearing land at the date of a withdrawal order was at that time engaged in diligent prosecution of work leading to discovery is a question of fact. No hard or fast rule applicable to all cases has or can be laid down by which it can be determined. Each case must depend to a large extent upon its own facts and circumstances. General principles only can be stated. It is not necessary that the work being performed at the time of the withdrawal was on the particular tract in question, but before it can be deemed work leading to discovery

thereon it must have been such as would reasonably tend to that end, and been presently and purposely designed for that purpose. Now, the drilling of an oil well on one location would not, however long continued, lead to discovery of oil on another. It might afford evidence of the probable existence of oil on the other, and justify the expenditure of money in exploring it. Indeed, it might, by disclosing the formation, materially aid in subsequent drilling, and lessen the expense. This result, however, would follow, whether the well was drilled by the occupant or claimant of the land in controversy, or by a neighbor, and hence I do not think that such work on one location can be held to be work leading to discovery on another. The proviso in the Pickett Act is somewhat indefinite and uncertain; but when interpreted in the light of the known conditions and the purpose of Congress, it was intended, I take it, to confer upon those occupying or claiming in good faith at the time of withdrawal public lands within a withdrawn area, with a bona fide intention of complying with the mining laws, and who were at such time in diligent prosecution of work leading to discovery thereon, the right to continue such work, if discovery was subsequently made, and the right to retain possession and extract the oil, or take title by patent, the same as if the land had not been withdrawn."

The foregoing is, in my opinion, a correct statement of the law, and does not necessarily conflict with either United States v. Grass Creek Oil & Gas Co., 236 Fed. 481, 149 C. C. A. 533, from the Eighth Circuit, or Consolidated Mut. Oil Co. v. United States, 245 Fed. 521, —— C. C. A. ——, from this circuit. It does not appear in either of these cases that the drilling for oil upon the lands in controversy was at all dependent upon results to be obtained from drilling on another and independent location. If it should be held in this case that the defendant was on the date of the withdrawal in the diligent prosecution of work leading to discovery of oil or gas on some particular quarter section, and it should later develop that no drilling was thereafter done on such location by reason of the fact that it had been fully demonstrated by drilling elsewhere that the land was not oil bearing, we would have this peculiar anomaly: The defendant would be found in the diligent prosecution of work leading to the discovery of oil or gas on a particular location, when as a matter of fact it never did any work leading to that end on that location, and never contemplated any such work except provisionally. For these reasons, as already stated, I am of opinion that there are two sides to the controversy, and that there is a debatable question before the Land Department for its determination.

I fully realize that the granting of an injunction or the appointment of a receiver is ordinarily a harsh remedy, and that such relief will only be granted in a clear case. Every case, however, depends upon its own peculiar circumstances, and the granting or withholding of the relief rests largely in the sound discretion of the court. Whether the relief should be granted or withheld depends upon many circumstances, among them the injury which will result to the defendant by granting the relief and the injury that may result to the plaintiff from withholding it. In the present case, the granting of an injunction against further drilling will not harm the defendant, unless it proposes to exercise that right, and there is nothing in the record to indicate that it intends to do so until the pending controversies are settled. If the appointment of a receiver should result in taking the management of this vast property away from the defendant, I would hesitate

long before taking such drastic action, and in my opinion the record before me would not justify such a course. But the authority of the receiver may be limited, as well as the duration of the receivership, and, if thus limited, little harm or inconvenience will result. Indeed, the proceeds of the oil from the disputed claims are practically impounded at the present time under the contract between the defendant and the Standard Oil Company, and if that contract should continue in force and if the parties should observe its provisions, there would be no necessity for the appointment of a receiver. But, as suggested on the argument, it rests entirely with the parties to that contract whether they continue it in force or abide by its terms. I realize also that there is nothing in the record to indicate that the defendant is insolvent, or in imminent danger of insolvency. In fact, the contrary is clearly shown. However, the life of oil wells is uncertain, assets of corporations may be distributed in dividends and what a few months may bring forth we do not know.

Under the circumstances, therefore, but not without doubt and misgivings, I have concluded to grant the injunction and to appoint a receiver for a limited time and with limited authority only, and to the end that the parties may be able to agree upon the form of decree without the necessity of my returning to California, the injunction granted will operate to restrain further drilling for oil on the claims in dispute, unless such drilling becomes necessary for the protection of the property. In that event leave will be granted upon further application to the court. A receiver will likewise be appointed, but the receiver will in no wise interfere with the present management of the property by the defendant. If in the future mismanagement is shown, which will result to the prejudice of the plaintiff, further authority will be granted to the receiver on his application. Furthermore, I see no reason why there should be any interference with the outstanding contract between the defendant and the Standard Oil Company, or why the receiver should not carry out its provisions. All moneys received, however, will go to the custody of the receiver, and, if deemed necessary, he will be authorized to pay operating expenses and the salaries of officers therefrom, although there seems to be no such provision in the Standard Oil contract. These in general will be the provisions of the decree, and to avoid the expense of an unusually large bond some provision should be made for depositing the moneys that come into the hands of the receiver in bank, with proper restrictions on their withdrawal.

I will only add, in conclusion, that the government must prosecute its protests before the Land Department with diligence, and the court will entertain a motion to terminate the receivership whenever satisfied that such a course is not pursued. Jurisdiction is reserved to make such other and further orders as may be found necessary or proper in the premises. Let a decree be submitted accordingly.