CONSOLIDATED MUT. OIL CO. et al. v. UNITED STATES (two cases).

(Circuit Court of Appeals, Ninth Circuit. August 20, 1917. Rehearing Denied October 8, 1917.)

Nos. 2787, 2788.

MINES AND MINERALS ☞36—OIL PLACER CLAIMS—RIGHTS OF CLAIMANTS— EFFECT OF WITHDRAWAL ORDER.

An oil placer mining claim, located on surveyed land by an association of eight persons, pursuant to Rev. St. §§ 2329–2333 (Comp. St. 1916, §§ 4628–4632), and covering a quarter section, constitutes a single claim, and under Act Feb. 12, 1903, c. 548, 32 Stat. 825 (Comp. St. 1916, § 4636) development work done on any one of a group of such claims not exceeding five, lying contiguous and owned by the same person or association, inures to the benefit of all, where it tends to their development. The President's proclamation of September 27, 1909, withdrawing certain oil lands from entry provides that "all locations or claims existing and valid on this date may proceed to entry in the usual manner after field investigation and examination," and Act June 25, 1910, c. 421, § 2, 36 Stat. 847 (Comp. St. 1916, § 4524) provides that "the rights of any person who, at the date of any order of withdrawal heretofore or hereafter made, is a bona fide occupant or claimant of oil or gas bearing lands, and who at such date is in the diligent prosecution of work leading to the discovery of oil or gas, shall not be affected or impaired by such order so long as such occupant or claimant shall continue in diligent prosecution of said work." At the time of the withdrawal proclamation one of the defendants, who was the owner of four contiguous quarter section claims, was in possession of the same through his lessee, which was then diligently prosecuting the work of development, and had commenced a well on one claim and expended $20,000 in preparations for drilling on each claim. This work was continued, and oil was found in paying quantities. In 1914 defendant entered and paid for the land, and there was issued to him a final receipt. *Held:* (1) That the exception in the President's proclamation in favor of existing and valid locations did not apply to claims on which oil had been discovered and to which the claimants therefore had an indefeasible equitable title, but applied to all locations to which the claimants had some valid right; (2) that the work done inured to the benefit of all of defendant's claims, and that under the facts he acquired a valid title which could not be questioned by the United States.

Gilbert, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern Division of the Southern District of California; Maurice T. Dooling, Judge.

Two suits in equity by the United States against the Consolidated Mutual Oil Company and J. M. McLeod. Decrees for complainant, and defendants appeal. Reversed.

See, also, North American Oil Consolidated v. United States, 245 Fed. 533, —— C. C. A. ——.

U. T. Clotfelter, of Los Angeles, Cal., and A. L. Weil, Charles S. Wheeler, and John F. Bowie, all of San Francisco, Cal., for appellants.

E. J. Justice, F. P. Hobgood, Jr., Frank Hall, Jas. W. Witten, and A. E. Campbell, Sp. Asst. Attys. Gen., all of San Francisco, Cal., and

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Albert Schoonover, U. S. Atty., of Los Angeles, Cal., for the United States.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge. The subject-matter of case No. 2787 is the northeast quarter, and of case No. 2788 the northwest quarter, of section 28, township 31 south, range 23 east M. D. M., and the oil contents of those lands. The facts in each case being substantially the same, the cases have been argued and submitted together.

The appellants, who were defendants in the court below, being in the possession of and claiming the right to the land and the oil it contained, which oil they were extracting by means of numerous wells, the government, on the 25th day of October, 1915, commenced the suits to recover both the lands and the value of the oil extracted, to quiet its title to the property, and also prayed for an injunction and the appointment of a receiver in each of the suits. A receiver having been appointed in each of them, the present appeals were taken from those orders.

Concerning the material facts, there seems to be no dispute; the differences between the parties involving only questions of law. Government lands, containing petroleum or other mineral oils, and that are chiefly valuable therefor, not withdrawn or otherwise reserved, may be entered and patented, and, indeed, only can be entered and patented, under the provisions of the laws relating to placer mining claims. 29 Stat. 526 (Comp. St. 1916, § 4635). It appears from the records that the predecessors in interest of the appellants located these lands, as also the other portions of the said section, under and by virtue of the laws governing placer claims.

Section 2329 of the Revised Statutes provides as follows:

"Claims usually called 'placers,' including all forms of deposit, excepting veins of quartz, or other rock in place, shall be subject to entry and patent, under like circumstances and conditions, and upon similar proceedings, as are provided for vein or lode claims; but where the lands have been previously surveyed by the United States, the entry in its exterior limits shall conform to the legal subdivisions of the public lands."

Section 2331 of the same statutes, so far as pertinent, is as follows:

"Where placer claims are upon surveyed lands, and conform to legal subdivisions, no further survey or plat shall be required, and all placer mining claims located after the tenth day of May, eighteen hundred and seventy-two, shall conform as near as practicable with the United States system of public land surveys, and the rectangular subdivisions of such surveys, and no such location shall include more than twenty acres for each individual claimant."

The provisions regarding veins and lodes are contained in sections 2320, 2322, 2323, and 2324 of the Revised Statutes (Comp. St. 1916 §§ 4615, 4618, 4619, 4620), and they include the requirement that the location must be distinctly marked on the ground so that the boundaries can be readily traced, and that a discovery of mineral be made within such boundaries. A location made by an association of persons, as said by Mr. Justice Henshaw, speaking for the Supreme Court of California in the case of Miller v. Chrisman, 140 Cal. 440, 449, 73 Pac. 1083, 1085 (98 Am. St. Rep. 63)—

"by the very terms of the law, is one location covering 160 acres, and not eight locations, each covering 20 acres. The boundaries required to be marked are the boundaries of the 160 acres, and not the boundaries of each separate 20 acres. The expenditure of $500 before patent issues is an expenditure required upon the whole land, and not an expenditure upon the 20-acre subdivisions thereof, and the only assessment work required is labor to the value of $100 upon the single location, and not upon any 20-acre subdivision thereof. Logically, therefore, since in marking boundaries, doing assessment work, and expenditure for patent the 160 acres are treated as an entirety under one location, for the purpose of discovery it should be treated in the same manner: and this is the ruling, with some conflict in its earlier decisions, which the Land Office of the United States has finally returned to and settled upon. In the case of Union Oil Co., 25 L. D. 351, it is explicitly declared: 'A placer location, if made by an association of persons, may include as much as 160 acres. It is nevertheless a single location, and as such only a single discovery is by the statute required to support it.' With this declaration we are in full accord."

Nor has Congress so far fixed any limit to the number of locations that may be made by the same person or persons—its policy having always been to encourage the exploration of the public lands and the discovery and development of such minerals as may be found in them. And it has long been the established law respecting such claims that, where two or more contiguous ones are held by the same person or persons, work done in good faith upon any one of them, or outside of the boundaries of either of them, which directly tends to the development or benefit of all of the claims for mining purposes, should be held applicable to each and all of such claims. Anvil Hydraulic & Drainage Co. v. Code, 182 Fed. 205, 105 C. C. A. 45, decided by this court, where will be found cited many cases to the same effect.

But, as respects oil mining claims, Congress, by act approved February 12, 1903 (32 Stat. 825), limited the number of a group of claims on which the annual assessment work might be done on one of the group for the benefit of the whole group in these words:

"That where oil lands are located under the provisions of title thirty-two, chapter six, Revised Statutes of the United States, as placer mining claims, the annual assessment labor upon such claims may be done upon any one of a group of claims lying contiguous and owned by the same person or corporation, not exceeding five claims in all: Provided, that said labor will tend to the development or to determine the oil-bearing character of such contiguous claims."

In this connection reference may be made to the decision of the writer in the case of Gird v. California Oil Co. (C. C.) 60 Fed. 531, which case is cited and relied on in support of the contention of the government in the present cases. The inapplicability of that case to the present ones will clearly appear from the statement that the Whale Oil claim was there sought to be held by reason of work claimed to have been done on others of a group of 80 claims, and from this extract from the opinion of the court in that case (60 Fed. 542):

"In the case at bar, none of the work done or expenditures made by the lessees of the plaintiffs, relied on to sustain the claim to the Whale Oil, were done or made on any claim contiguous to it. It is true that the evidence shows that, prior to the making of the leases in 1886 and 1887, Udall from time to time, under and pursuant to the local rules of the district, did considerable work in building roads in the district, and on the road that led in

the direction of the Whale Oil claim. But the local rules, in so far as they conflict with the act of Congress, are of course, of no avail, and that, as has been repeatedly stated, requires an annual expenditure of $100 in work or improvements on each claim, provided that, where the claims are held in common, such expenditure may be made upon any one claim. But, to come within this latter provision, the claims so held in common must, as said by the Supreme Court in Chambers v. Harrington [111 U. S. 350, 4 Sup. Ct. 428, 28 L. Ed. 452], be contiguous, and the labor and improvements relied on must, as held in Smelting Co. v. Kemp, 104 U. S. at page 655 [26 L. Ed. 875], be made for the development of the claim to which it is sought to apply them; that is in the language of the Supreme Court, 'to facilitate the extraction of the minerals it may contain.' This, I think, cannot be justly affirmed of any part of the large expenditures shown to have been made by the lessees of the plaintiffs in the development of some of the claims embraced by the leases, all of which are remote from, and none contiguous to, the Whale Oil. I have not overlooked the contention of plaintiffs' counsel that by the well the lessees of the plaintiffs commenced on the Kenyon claim they hoped and expected, in years to come, to draw the oil from the Whale Oil claim, which is distant from the Kenyon considerably more than a mile, and between which and the Kenyon is a mountain range. The time when this result might be reached was fixed by the plaintiffs' witness who advanced the theory at from 10 to 100 years. When to this is added the fact that the well that was thus expected to extract the oil from the Whale Oil claim was not commenced until 1891, which was after the location of the Razzle Dazzle claim, upon which the defendant relies, nothing more need be said to show that work upon the well upon the Kenyon claim cannot be counted to maintain the validity of the Whale Oil location."

It is also the well-established law that in the absence of any intervening bona fide rights—and there are none in either of the present cases—the order in which the statutory requirements concerning the making of the locations are complied with is immaterial; that the marking of the boundaries of a claim may precede the discovery, or the discovery may precede the marking, and, if both are complete before the rights of others intervene, the earlier act will inure to the benefit of the locator as of the date of the later, and a complete possessory title to the premises will vest in him as of the later date. Erhardt v. Boaro, 113 U. S. 527, 5 Sup. Ct. 560, 28 L. Ed. 1113; Nevada Sierra Oil Co. v. Home Oil Co. (C. C.) 98 Fed. 673; Jupiter Min. Co. v. Bodie Consol. Min. Co. (C. C.) 11 Fed. 666; North Noonday Min. Co. v. Orient Min. Co. (C. C.) 1 Fed. 522; Zollars v. Evans (C. C.) 5 Fed. 172; Strepey v. Stark, 7 Colo. 614, 5 Pac. 111; Thompson v. Spray, 72 Cal. 528, 14 Pac. 182.

Passing for the present any consideration of the act of Congress of June 25, 1910, known as the "Pickett Act" (36 Stat. 847), it is entirely true that until discovery the locator can acquire no right as against the government; but it is well settled that, while in the bona fide effort to make such discovery, the ground that he has marked in accordance with the provisions of the statute, and of which he is in the actual possession, will be protected by the courts against any forcible, fraudulent, surreptitious, or clandestine entry by any third party, although it is open to the entry of others by any legal means for the purpose of locating it under the mining laws. Sparks v. Pierce, 115 U. S. 408, 413, 6 Sup. Ct. 102, 29 L. Ed. 428; Belk v. Meagher, 104 U. S. 279, 287, 26 L. Ed. 735; Olive Land & Development Co. v. Olmstead (C. C.) 103 Fed. 568, 573; Cosmos Exploration Co. v.

Gray Eagle Oil Co., 112 Fed. 4, 14, 50 C. C. A. 79; 61 L. R. A. 230; Rooney et al. v. Barnette et al., 200 Fed. 700, 119 C. C. A. 116; Garthe v. Hart, 73 Cal. 541, 15 Pac. 93; Horswell v. Ruiz, 67 Cal. 111, 7 Pac. 197; Miller v. Chrisman, 140 Cal. 440, 447, 73 Pac. 1083, 74 Pac. 444, 98 Am. St. Rep. 63; Smith v. Union Oil Co., 166 Cal. 217, 224, 135 Pac. 966; McCormick v. Varnes, 2 Utah, 355; Hopkins v. Noyes, 4 Mont. 550, 2 Pac. 280.

That right of possession against all intruders this court in the case of Rooney v. Barnette, supra, expressly held is a right that the possessor can convey to another, as did the Supreme Court of California in Miller v. Chrisman, supra, and as have many other courts. The rights thus possessed by the locator to maintain his possession against intruders while in good faith seeking to discover minerals within the boundaries of his claim, and to convey such possession before discovery, are, as said in Miller v. Chrisman, rights of value. After discovery they manifestly become binding upon the government, and protected by the Constitution. While it is possible that at times oil may be found issuing from the surface of the ground (in which case discovery, of course, may be made without difficulty or expense), it is matter of common knowledge that almost always drilling is essential to such discovery, and in many sections—particularly in the region where the lands in question are situate—drilling to great depth, involving heavy costs.

The records show that the lands here involved are situate in an arid region, where water at the times in question was obtained with great difficulty and at heavy cost, and that drilling without some water was impossible; that in such circumstances the appellant McLeod, on the 25th day of June, 1909, leased upon a royalty basis to a corporation called Mays Oil Company, afterwards known as Mays Consolidated Oil Company, the south half of the northwest quarter, the north half of the southwest quarter, the northeast quarter, and the southeast quarter of the said section 28, under which lease the lessee entered into the immediate and exclusive possession of those tracts of land. The lease (subsequently acquired by the appellant Consolidated Mutual Oil Company) provided for the drilling of wells upon each of the quarter sections embraced by the lease, in the effort to discover and take oil therefrom, for continuous and diligent work by the lessee to that end, and for the working of all of the said claims as a unit. And it was shown in each case, upon the application for the appointment of a receiver, that during the brief period that intervened between the execution of the lease and the making by President Taft of the proclamation of September 27, 1909, entitled "Temporary Petroleum Withdrawal No. 3," the lessee built a two-inch pipe line more than three miles in length to connect with the main of a water company called Stratton Water Company, constructed a standard derrick on each of the claims, built on the northeast quarter of the section a water tank with pipe line connections, a bunkhouse and a cookhouse, containing a dining room sufficient for the seating of 40 men, a kitchen, and bedroom; on the northwest quarter of the section it built another bunkhouse 20x30 feet in size; and on the southeast quarter it built a stabling yard for its

freight teams and for a buggy and horses—in addition to which it built a boiler house and erected machinery for operating one full string of tools for drilling at the derrick on the southwest quarter of the section.

It further appears that, not only did the said lessee have, on the day of the issuance of the President's proclamation, the undisputed possession of all of the property covered by the lease, but was then actually drilling a well by means of the derrick on the southwest quarter of the section, having commenced to do so the preceding month, and which well was then about 830 feet in depth. Moreover, it is shown without conflict that the lessee had abundant means to carry out its undertaking, and but for the impossibility of securing the necessary water would have been sinking at each of the derricks on the other quarters of the section; that it intended and had directed the successive sinking of the other wells as soon as oil should be struck in the first one, and was so intent on the speeding of the work as to offer and pay a bonus to its employés for extra work.

It is not contended that the land in question was not subject to location under the mining laws by the predecessors in interest of the appellant McLeod, nor that the boundaries of the respective claims were not properly marked on the ground, nor that there was any intrusion upon the actual possession of the appellants or upon that of their predecessors in interest. Up to the time of the proclamation by the President, however, there had been no discovery of oil or any other mineral on any of the land, and consequently at that time the government was at liberty to at once withdraw it from any sort of disposition, either through act of the Congress or by order of the President, as was adjudged by the Supreme Court in the case of United States v. Midwest Oil Co., 236 U. S. 459, 35 Sup. Ct. 309, 59 L. Ed. 673—three of the Justices dissenting.

In pursuance of the power vested in him, President Taft on September 27, 1909, issued this proclamation:

### "Temporary Petroleum Withdrawal No. 5.

"In aid of proposed legislation affecting the use and disposition of the petroleum deposits on the public domain, all public lands in the accompanying lists are hereby temporarily withdrawn from all forms of location, settlement, selection, filing, entry, or disposal under the mineral or nonmineral public land laws. All locations or claims existing and valid on this date may proceed to entry in the usual manner after field investigation and examination."

It is insisted on behalf of the government that the exemptions from the effect of the order of the President therein provided for cannot be properly held to apply to any land upon which at the time of its promulgation no mineral had been discovered, even though, as in the present cases, the land had been located under and by virtue of the mining laws, its boundaries properly marked on the ground, and the assignees of the locators then in its bona fide actual possession, actively engaged in seeking mineral therein.

A discovery of mineral in the ground under such conditions would manifestly have perfected the locations, not only against third parties, but also against the government, and would have given to the owner of them an equitable title against the United States, and have entitled the

owner to the legal title upon compliance with the statutory requirements respecting annual assessment work and payment, which rights would have been secure under the provisions of the Constitution of the United States. Such locations upon which discovery had then been made needed .no protection through any order of the President. Said the Supreme Court in Belk v. Meagher, 104 U. S. 279, 283 (26 L. Ed. 736):

"A mining claim perfected under the law is property in the highest sense of that term, which may be bought, sold, and conveyed, and will pass by descent."

It is not, therefore, added the same court in Sullivan v. Iron Silver Mining Co., 143 U. S. 431, 434, 12 Sup. Ct. 555, 36 L. Ed. 214, "subject to the disposal of the government."

President Taft, who had himself been a distinguished federal judge, of course well knew this, and we think it altogether unreasonable to hold that the words employed by him in his order, "All locations or claims existing and valid on this date may proceed to entry in the usual manner after field investigation and examination," were intended, or can be fairly construed, to apply to lands upon which discovery had already been made and to which its locators had already acquired an equitable title, but, on the contrary, that they were intended, and should be held, to apply to all locations and claims existing at the time of the making of the withdrawal order to which the locators or claimants had some valid right. See United States v. Winona & St. P. R. Co., 165 U. S. 463, 478, 479, 17 Sup. Ct. 368, 41 L. Ed. 789.

That the appellants then had in the lands here in question valuable rights of possession and conveyance, which the courts of the country would protect and enforce, and consequently valid rights, has already been shown—rights, too, acquired by the license, if not by the invitation, of the government, and in the pursuance of which the lessee of this property had then, according to the records, already expended more than $20,000, and which land it continued to diligently explore and develop at very large additional expense for years, without objection by the government or by any third party so far as appears. And by its act of June 25, 1910 (36 Stat. 847), entitled "An act to authorize the President of the United States to make withdrawals of public lands in certain cases," Congress expressly declared:

"That the rights of any person who, at the date of any order of withdrawal heretofore or hereafter made, is a bona fide occupant or claimant of oil or gas bearing lands, and who, at such date, is in diligent prosecution of work leading to discovery of oil or gas, shall not be affected or impaired by such order, so long as such occupant or claimant shall continue in diligent prosecution of said work."

This was the first legislative recognition ever made by Congress of any right on the part of an occupant or claimant of oil bearing lands prior to the discovery of oil thereon. By that act, which was obviously a remedial statute, and therefore to be liberally construed to effect its object, Congress expressly gave to the good-faith occupant or claimant of either oil or gas bearing lands, who, at the date of the act, was "in diligent prosecution of work leading to discovery of oil or gas," a status. That the appellants were at the time of the passage of the act in the actual and exclusive possession of the lands here in controversy and in diligent prosecution of work on one of two contiguous claims for

the benefit of both, as well as other contiguous ones, in the effort to discover oil thereon, which continuous work resulted in the discovery of oil in each of the quarter sections here involved in large quantities, is clearly shown, and that the appellants continued from the date of the passage of the said act "in diligent prosecution of said work" is undisputed. We therefore regard it as clear that the appellants also come within the express provisions of the act of June 25, 1910.

In deciding adversely a much stronger case for the government than are the present ones, the Circuit Court of Appeals of the Eighth Circuit, in the recent case of United States v. Grass Creek Oil & Gas Co. and Ohio Oil Co., 236 Fed. 481, 487, 149 C. C. A. 533, 539, in speaking· of the act of June 25, 1910, said:

"It is claimed that actual drilling operations were not commenced until July 1, 1914, on the northwest quarter, and on July 31, 1914, on the east half of the southwest quarter, and that until the actual drilling was begun there was no prosecution of work within the meaning of the act of Congress. We are of the opinion that this is too narrow a view to take of this statute. The enactment of this proviso by Congress could have had but one object in view, and that was to protect the rights of all persons who, at the date of an order of withdrawal, are occupying or claiming oil-bearing lands in good faith, for the purpose of acquiring them under the laws of the United States, and are diligently prosecuting the work leading to the discovery of oil. Before the enactment of this statute discovery of the mineral was essential to make a location. As frequently—in fact, in most instances—prospecting was necessary in order to determine whether oil or gas are on the public lands, and large sums of money were necessarily expended to ascertain this fact, Congress by this proviso in the act of 1910 extended its protecting arm to those acting in good faith in an effort to ascertain whether there was oil or gas under them. In our opinion, when a citizen of the United States in good faith enters upon public land for the purpose of discovering oil or gas, takes possession of the land by placing a caretaker thereon while he is taking proper steps to obtain the material necessary for the work of constructing the camps, enters into contracts for drilling, acting as expeditiously as possible in erecting camps and preparing for the drilling, spends money and enters into contracts whereby he becomes liable for sums of money to prosecute the work leading to the discovery of oil or gas, and as soon as it is possible, by the exercise of proper diligence, begins the work of drilling, and continues it diligently and expeditiously until oil is discovered in commercial quantities, he is within the protection of this proviso."

The facts in the cases of United States v. Midway Northern Oil Co. (D. C.) 232 Fed. 619, were very different from those in the present cases, as will clearly appear from this excerpt from the opinion of the learned judge who decided them:

"No discovery of oil had been made on any of the lands at the date of the first· withdrawal order, nor was any one in possession thereof at that time actually engaged in work looking to a discovery. In suits 47, A–2, A–3, and A–30 sundry parties had, prior thereto, posted on the land involved in each of the suits and caused to be recorded a notice claiming a location of the land as a petroleum placer mining claim under the mining laws of the United States; but no discovery of oil had been made or any work done thereon, except some so-called assessment work, which consisted in excavating sump holes, building small cabins, and the erection of a couple of derricks on one of the tracts, which derricks were never used or equipped for drilling, but were subsequently taken down and removed to other parts of the premises. After the first withdrawal order, parties claiming as lessees of the so-called locators in the four cases referred to, and in the other two without any previous notice of location, commenced drilling operations in each of the tracts

involved in the fall of 1909 or early in 1910, and continued thereafter until the discovery of oil, which they were extracting and disposing of when these suits were commenced against the parties in possession, the so-called locators, the purchasers of the oil, and others."

Moreover, Congress by its act of March 2, 1911 (36 Stat. 1015, c. 201 [Comp. St. 1916, § 4637]), gave statutory recognition of the right of transfer or assignment by the locator, under the mining laws, of any land containing oil or gas, to any qualified person, persons, or corporation "prior to discovery of oil or gas therein," provided "that such lands were not at the time of inception of development on or under such claim withdrawn from mineral entry."

But, over and above what has been said, the records show that upon due application to the Land Office of the United States the appellant McLeod was permitted to enter the lands here in question, for which he paid to the government $1,600, receiving therefor its register's final certificate of entry, issued October 31, 1914, which certificate it appears remains uncanceled, and concerning which the bills in these suits, filed as above stated October 25, 1915, are entirely silent. In speaking of a similar receipt issued to the Brick Company in the case of El Paso Brick Co. v. McKnight, 233 U. S. 257, 34 Sup. Ct. 498, 58 L. Ed. 943, L. R. A. 1915A, 1113, the Supreme Court said:

"The entry by the local land officer issuing the final receipt was in the nature of a judgment in rem (Wight v. Dubois [C. C.] 21 Fed. 693), and determined that the Brick Company's original locations were valid and that everything necessary to keep them in force, including the annual assessment work, had been done. It also adjudicated that no adverse claim existed and that the Brick Company was entitled to a patent. From that date, and until the entry was lawfully canceled, the Brick Company was in possession under an equitable title, and to be treated as 'though the patent had been delivered to' it. Dahl v. Raunheim, 132 U. S. 260, 262 [10 Sup. Ct. 74, 33 L. Ed. 324]. And, when McKnight instituted possessory proceedings against the Brick Company, the latter was entitled to a judgment in its favor when it produced that final receipt as proof that it was entitled to a patent and to the corresponding right of an owner."

Not only has no attack, so far as appears, been made by the government on the register's final certificate of entry, but there is in these cases not the slightest showing of any fraud or lack of good faith at any time on the part of the appellants or of any of their predecessors in interest. True, the bills of the government, which were verified by an agent upon information and belief, alleged that the location notices under which the appellants claim were posted by "mere dummies" to enable "defendant McLeod or some one else" to obtain the land; but that allegation was put in issue by positive denial under oath and there was no undertaking whatever to sustain the charge. Among the affidavits filed in opposition to the appointment of receivers was one made by the president of the appellant company, stating as facts the following, which were uncontradicted:

"That the said Consolidated Mutual Oil Company acquired and entered into possession of said properties in the month of February, 1914, and from that time forward this deponent has been the president of said corporation, and has had the active management of its affairs; that at the time that the Consolidated Mutual Oil Company took possession of said section 28, as aforesaid, there were situate on the said section six completed wells in which oil had

been discovered in paying quantities, and there were two wells upon which drilling had been started, and which had been partially drilled; that since the said corporation acquired the said properties it has erected upon the said properties elaborate improvements and drilled three new wells, and has also proceeded with the drilling work that was in progress at the time that the said properties were acquired; that the said corporation has during the said period laid out and expended in improvements upon said property, and in drilling wells and in exploration and development work, a sum in excess of $150,000, and that the improvements now upon the said property are of a value in excess of $150,000; that the occupation of the said section 28 by the said corporation, and its predecessors in interest, were and have been at all times open, notorious, and were at all times actually known to the Land Department of the United States government, and that whatever activities in the way of development and improvement of the said property have taken place were with the full knowledge of the officers and agents of the Land Department of the United States; that during all of the said period of time the said corporation has given to the agents of the Land Department free access to its books and records of all kinds, and the said United States government has at all times during the said period had actual reports and knowledge of the improvements that the said corporation was making upon said property, and has had access to the books and papers of said corporation showing the amount of oil that it had extracted and was extracting, and showing the contractual obligations which said corporation was under in the matter of its equipment and the disposition of its oil supply; that during all of the said time the plaintiff, through its officers and agents of its Land Department, has had actual knowledge that the defendant Consolidated Mutual Oil Company was in possession of the said property under a claim of right, and it had during all of said period of time and until the filing of this suit stood by and knowingly permitted the said defendant corporation, without objection, to make the aforesaid expenditures of money, and to extract oils from said properties, and to incur obligations in and about the development of said property, and to develop the said property to its present condition, and to extract therefrom the very oil the value of which it is here seeking to recover; that deponent is informed and believes, and on such information and belief avers, that similarly with full knowledge of the facts concerning the location and possession and the work that had been done upon the said section 28 on and prior to the 27th day of September, 1909, plaintiff stood by and knowingly permitted the predecessors in interest of the said Consolidated Mutual Oil Company to remain in undisputed possession of the said premises and to expend, in work and labor tending to the development of oil on said property, upwards of $200,000; that the money so expended had been expended in large part in developing the identical wells upon the said property which were producing oil at the time that the said Consolidated Mutual Oil Company purchased the said property, and that the purchase of the said property by the said corporation was largely induced by the said developments; that because of the said development the said corporation has paid to its predecessors in interest more than $500,000."

In each case the order appealed from is reversed.

GILBERT, Circuit Judge (dissenting). In the first place, I think it is error to hold that the land in question was occupied under a location or claim "existing and valid" within the language of the exception found in the withdrawal order of September 27, 1909. The reasoning in United States v. McCutchen (D. C.) 234 Fed. 709, and United States v. Midway Northern Oil Co. (D. C.) 232 Fed. 619, is, I think, convincing.

In the second place, I think it extremely doubtful whether an association claim, such as that which is involved in the present case, is

protected by the provisions of the Pickett Act of June 25, 1910, any further than that particular tract which may have been in the actual possession of a bona fide occupant or claimant, who, at the date of the withdrawal, was in the diligent prosecution of work leading to discovery of oil or gas. The notices of the location of the association claim involved in this case were filed in January, 1909. In June following the interests of all the persons who had filed the notices were transferred to McLeod. At that date no discovery had been made, and no work had been done. At the time of the withdrawal no work at all had been done on either of the quarter sections involved in these two suits, and no one was in diligent prosecution of work thereon leading to discovery of oil or gas. See United States v. Stockton Midway Oil Co. (D. C.) 240 Fed. 1010. An important distinction between these cases and the case of United States v. Grass Creek Oil & Gas Co., 236 Fed. 481, 149 C. C. A. 533, decided by the Circuit Court of Appeals for the Eighth Circuit, is that in the latter case, at the time of the withdrawal, all of the original locators of the association claim were in the actual possession by their lessee.

In the third place, the appeal presents the single question whether the court below, in appointing a receiver, abused the discretion which was vested in it. In Bosworth v. Terminal Rd. Ass'n, 174 U. S. 182, 186, 19 Sup. Ct. 625, 627 (43 L. Ed. 941), Judge Brewer said:

"But the appointment of a receiver is a matter resting largely in the discretion of the court—not, of course, an arbitrary, but a legal, discretion—and depending, not simply upon the breach of a condition in the mortgage, but also upon the question of relative injury and benefit to the parties and the public by the taking of the property out of the possession of the mortgagor, and placing it in the hands of a receiver."

In Hutchinson v. American Palace Car Co. (C. C.) 104 Fed. 182, 187, Judge Putnam said:

"The same principles apply with reference to the exercise of discretionary powers for the appointment of receivers as to the exercise of discretionary powers for preliminary injunctions."

In Briggs v. Neal, 120 Fed. 224, 56 C. C. A. 572, the Circuit Court of Appeals for the Fourth Circuit held that the appointment of a receiver is discretionary, and will not be reviewed, unless a gross abuse of discretion is shown. And all the authorities hold that the appointment of a receiver pendente lite, like the granting of an interlocutory injunction, is a matter resting, with certain limitations, within the discretion of the court to which the application is made, to be governed by a consideration of all the circumstances in the case. The courts have always recognized the propriety of appointing receivers in mining property, where the substance of the property in controversy may be wasted by the extraction of ores. In High on Receivers (3d Ed.) § 615, it is said:

"The aid of a receiver is sometimes granted in cases of mines or collieries pending a litigation which is to determine the title and rights of the parties, when, from the peculiar nature of the property, it is necessary that it should be kept in operation and preserved pendente lite."

In Elk Fork Oil & Gas Co. v. Foster, 99 Fed. 495, 39 C. C. A. 615, where the bill sought only an injunction, the Circuit Court of Appeals

held that the District Court had the discretion on its own motion to appoint a receiver. The court quoted with approval from 15 Am. & Eng. Enc. of Law, 605, the following:

"Working of mines is something more than the common and ordinary use of real estate, and required the use of more than ordinary remedies to protect the rights of a party entitled to the possession. The granting of an injunction, and, if necessary, the appointment of a receiver, are common remedies."

The complaint in each of these cases involves a quarter section of land on which, at the time of the withdrawal, no well had been commenced. The complaint distinctly charged that the location of the association claim, purporting to have been filed in the names of Taylor, Powell, Darling, Pentz, Freeman, Thorne, Harder, and Searles, was in fact posted by and for the sole benefit of McLeod, and that the names of the locators were used to enable McLeod, or some other person than the locators, to acquire more than 20 acres of mineral land, in violation of the laws of the United States; that the said persons whose names were so used in said location notice were not bona fide locators, and each of them was without an interest in said location notice so filed, and their names were not used to enable them to secure said land, but that each was a mere dummy, used for the purposes alleged. The answers denied these allegations. The judge of the court below in his opinion stated that in his judgment the present status of the property in the cases should be maintained, either by enjoining the withdrawal of oil or by the appointment of a receiver, "until the right of defendants to withdraw oil from the land is finally determined, either by the Land Department or by the court. It seems to me that the appointment of a receiver will work less hardship to defendants than the granting of an injunction."

The defendants in their answers pleaded the provisions of the Pickett Act, and alleged that they had acquired the association claim by complying therewith. The burden of proof was upon them to prove that this was true. On the hearing of the application for the receiver, they presented affidavits tending to show that it was true. Was the court below bound to accept those affidavits as final and conclusive, and therefore deny the application for a receiver? I think not. Perhaps the members of this court would not have appointed a receiver upon the showing made, but that is not the question here. The question is whether the court below manifestly abused the discretion which was lodged in it. That court may have entertained the opinion of the meaning of the Pickett Act which I have outlined above. If it did, a clear case was made for the appointment of a receiver to prevent waste. It may have been of the opinion that the showing made by the affidavits, made as they were by interested parties, was not sufficient to prove the diligence which the Pickett Act required. If so, the appointment of a receiver was not an abuse of discretion. Lands which have ceased to be public lands, by reason of the initiation of pre-emption and homestead and other claims, are still so far public lands that the United States may protect them from waste. Shiver v. United States, 159 U. S. 491, 16 Sup. Ct. 54, 40 L. Ed. 231.