### UNITED STATES v. CALIFORNIA MIDWAY OIL CO. et al.

(Circuit Court of Appeals, Ninth Circuit. February 20, 1922.)

#### No. 3682.

1. **Mines and minerals** ⬦⟹38(15)—**Charges of fraud in location of oil claims held not sustained by evidence.**

A charge of fraud in the location of an association oil placer mining claim, based on an allegation of conspiracy between the persons executing powers of attorney under which the location was made and the one to whom they were given to locate the claim for the sole benefit of the latter, *held* not sustained by evidence showing that the grantors and grantee of the powers were strangers to each other, and that they were executed at the instance of third persons, with no intention that they should be illegally used.

2. **Mines and minerals** ⬦⟹36—**Valid location of oil claim held not invalidated by subsequent fraud of attorney making the location.**

Where the location of an association oil claim made by an attorney in fact was valid when made, it is not subject to cancellation as fraudulent because the attorney in fact subsequently defrauded his principals by acquiring the claim for himself without informing them of its value.

Appeal from the District Court of the United States for the Northern Division of the Southern District of California; Robert S. Bean, Judge.

---

⬦⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suit in equity by the United States against the California Midway Oil Company and others. Decree for defendants, and complainant appeals. Affirmed.

For opinion below, see 259 Fed. 343.

The United States brought a suit to enjoin waste of the oil contents of the northwest quarter of a section of land in Kern county, Cal., the legal title thereto being in the United States. On or about January 1, 1907, L. B. McMurtry located the quarter section as an association claim, as attorney in fact for eight persons living in Chicago. In the fall of 1908, as attorney in fact for such locators, McMurtry entered into a contract with Mrs. McLeod for the development of the quarter section, as well as the adjoining northeast quarter, which he had also located as attorney in fact for other Chicago locators. Under the terms of the contract, Mrs. McLeod was to drill for oil on each tract, and if it proved to be oil-bearing she was to have one-half of each thereof. Subsequently the contract was modified, so that her portion of the land was to be the south 60 acres of each quarter section. Her interest became vested in the California Midway Oil Company, one of the appellees herein. Shortly thereafter defects were discovered in the locations so made, and McMurtry promised to remedy the same. Later he determined to relocate the land, and he called upon four persons, Thickens, Thorne, Powell, and Searls, who resided in New York, and who had there been associated with him in oil land and stock ventures, to secure for him four powers of attorney to locate associated mining claims of 160 acres each, and he stated to them that, if they would aid him, he would be able to recoup his losses and theirs. In pursuance of that request signatures of New York persons to four powers of attorney were obtained. One of those powers of attorney was that under which, on January 1, 1909, McMurtry relocated the quarter section in controversy here. Those who signed it were for the most part employés of the four persons to whom McMurtry had made the request. All who signed were informed that they would not be required to expend any money. One or two of them were told that they might make some money out of it. The powers of attorney bore date of December 21, 1907, and they conferred power upon McMurtry to locate claims, to develop them, and to sell and dispose of them.

None of the signers knew McMurtry, nor had any communication with him. They all signed as a friendly act of accommodation to the persons who asked them to sign. A few days after the relocation McMurtry, as attorney in fact of the locators, agreed with the California Midway Oil Company that it should proceed with the development of the property so located. Under that agreement development was prosecuted to discovery. On May 17, 1909, McMurtry as attorney in fact conveyed the interest of the New York locators in the entire north half of the section to McLeod, subject to the outstanding contract with the California Midway Oil Company, and McLeod agreed in writing that, if there should be discovery on either of the quarter sections, he would make application for patent, and upon the issuance of receiver's final receipt would convey to the locators thereof the north 100 acres of each quarter section. On December 3, 1909, McMurtry, as attorney in fact, assigned all right, title, and interest in his contracts of May 17, 1909, and in his contracts with McLeod to C. L. Clafflin, who was McMurtry's attorney, and on the following day Clafflin transferred the same back to McMurtry, in his individual name. About May 10 McMurtry as attorney in fact for the New York locators made a sale of the west 40 acres of the north 100 acres of the northwest quarter to a corporation for $100,000, for which he received in cash $10,000, and a mortgage for the remainder. Default was made in the payment of the remainder, and on November 22, 1912, that corporation conveyed the property to McMurtry in his individual name, and it so stands of record.

On August 4, 1910, a contract was entered into between the New York locators, by McMurtry as their attorney in fact, and certain persons acting for the Associated Oil Company, reciting that they had powers of attorney from 16 named persons, that they had located the north half of section 32, and that they owned the same subject to the agreement of May 17, 1907, with McLeod;

that the Thirty-Two Oil Company had an apparent interest in the property and McMurtry had an interest in the said lands with the 16 persons who were the locators, and that McMurtry was their attorney in fact, with the right to sell their interest in the property, and the contract provided that in consideration of $5,000 paid to McMurtry by the agents of the Associated Oil Company he would place in escrow deeds executed by himself as attorney in fact for each and all of the locators of their interest in the north 100 acres of each quarter section, except the west 40 acres of the northwest quarter, and deeds from McLeod and the Thirty-Two Oil Company and himself individually, conveying their interest in the property to said grantees; that he (McMurtry) would proceed forthwith to obtain from the locators deeds in proper form to be recorded, also an acknowledgment that at the date of his agreement his powers of attorney were in full force and effect, also ratification of each of the locators of the execution of such deeds. The purchase price of the 160 acres in the north half of the section was $430,000, of which $255,000, with interest, was to be paid in production, and $85,000 in cash was to be deposited in escrow, and another $85,000, with interest, was to be paid within 6 months thereafter.

To carry out that agreement McMurtry sent to each of the locators under whose power of attorney he had located the quarter section in controversy here the sum of $250, and received from each of them a receipt for that sum "in full payment for all my right, title, and interest in and to all lands located by said L. B. McMurtry on my behalf in Kern county, California, pursuant to a power of attorney made by myself and others to L. B. McMurtry, bearing date the 19th day of December, 1907." The payment to the New York locators and the presentation of a receipt to be signed by them was the first communication that had come to them from McMurtry since their execution of the power of attorney some three years before. Some of them had forgotten that they had signed the power of attorney. They all signed the receipts without making inquiry as to the acts of McMurtry, and without any knowledge whatever of the source from which the money came, or the acts that had been done under the power of attorney. In August, 1911, McMurtry organized a corporation known as the Pacific Oil Land Company, with a capital of 1,000,000 shares, of the par value of $1 each, and he subscribed for all of the shares except 3. On September 1, 1911, for himself and as attorney in fact for the New York locators, he transferred to that corporation his and their interest in the contract of August 4, 1910, together with the contract with McLeod covering the entire section. A short time thereafter McMurtry caused to be issued 1,000 shares of the stock to each of 32 New York locators, under whose powers of attorney he had been locating lands, so that each of the New York locators of the land in controversy here received 1,000 shares of the 1,000,000 shares so subscribed by McMurtry. It was explained to them that McMurtry had organized the corporation for the purpose of handling the property located by him and that the shares issued to them represented their interest therein. He advised them to hold the stock as it would prove valuable.

In December, 1913, they were informed by the secretary of the Pacific Oil Lands Company that the corporation had $20,000, which it wished to distribute among its stockholders, as a dividend, but that it would be necessary for them under the laws of California to send a written consent to the distribution. They accordingly signed such written consent, and each received a dividend of $20; also a statement of the Pacific Oil Lands Company's first report to stockholders. In the spring of 1914 F. H. Searls called upon the locators of the land in controversy and offered to take up their stock in the Pacific Oil Lands Company and to pay them each $250. They accepted the offer and transferred their stock, so that out of the northwest quarter section so located in their name the New York locators each received in full of his interest therein in the aggregate the sum of $520. Each of the New York locators, except one who had died, testified as a witness for the government. Bashore said he was requested by Thickens to sign the power of attorney; that Thickens said it would mean a lot to him, as well as assist Mr. McMurtry. "I did not hesitate to affix my signature, knowing that I would not be

involved financially in any way, shape, or form; had no intention of acquiring lands for myself." Walker also signed at the request of Thickens, as a favor to him "because he was my boss and employer." Keenan testified that Thickens said: "I want you to give me your power of attorney, and I want Mr McMurtry to locate oil lands for us in California." Metz testified that Thickens told him he would probably make a lot of money in it. Naturally, he said, he became interested and was willing to sign it. Romaine, Jr., testified that the matter was explained to him by Thickens, and that he thereupon signed the power of attorney. Walker said that Thickens told him that if he would give him a power of attorney to locate oil lands it would prove valuable. Mahr said that Thickens asked him to sign the power of attorney, and that he did so without reading it; that he was told it was "a power of attorney to locate lands for you in California." At the time when the first $250 was paid to the locators, Thickens wrote to Walker, one of the locators: "Just a little money coming to you for your kindness in signing a paper for me three years ago."

In explaining why 1,000 shares were issued to each of the locators, McMurtry testified: "I don't know that there was any particular rule worked out as to why 1,000 shares of stock were given to each of the locators. I thought that was what they were entitled to hold. Yes; I determined the question as I did the amount of $250, which was paid to each of them in 1910 and 1911."

Raymond Benjamin and Charles D. Hamel, Sp. Asst. Attys. Gen., for the United States.

Henry Ach and Oscar Sutro, both of San Francisco, Cal., Geo. E. Whitaker, of Bakersfield, Cal., Jordan & Brann, of San Francisco, Cal., and Robert M. Pease and U. T. Clotfelter, both of Los Angeles, Cal., for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). [1] It is the contention of the government that the makers of the power of attorney and McMurtry intended to circumvent the law, and that their action was in effect the result of a conspiracy to violate the statute. The bill alleges that the location was made for the use and benefit of McMurtry, or some person other than the persons named in the location notice. The court below held that the question thus presented was one of fraud, and that fraud must be established by clear, unequivocal, convincing proof, and that the evidence did not measure up to the requisite degree of proof. As we regard the case, there was evidently no conspiracy between McMurtry and the makers of the power of attorney. The case for the government must stand or fall upon the bona fides of the location which was made. It seems clear that there was no fraudulent intent upon the part of the signers of the power of attorney at the time when they signed it, and that they had no thought that it was to be used illegally, or that they were doing, or authorizing McMurtry to do, an unlawful act. If, however, the power of attorney was procured and used by McMurtry for the purpose of acquiring oil land in violation of the statute, it follows that the location was fraudulent.

We have no means of knowing what was in McMurtry's mind when he procured the power of attorney, other than what may be inferred from his subsequent acts in pursuance thereof. But those acts are not sufficient in themselves to establish fraud, although the facts and cir-

cumstances seem to indicate that after locating the claim McMurtry came to regard as negligible the rights of the locators, and the interests acquired by them. It further appears that he had no agreement with them as to what he should get out of the venture, and that without consulting them he determined what his own share should be. The locators had from him no information of any kind until nearly three years after they signed the power of attorney. Then they were asked to sign a receipt and release to him all interest in the located mining claim upon the payment of $250 to each of them. Prior to that time McMurtry had realized in cash out of the land so located $10,000, and had taken title to himself in his individual name of 40 acres of the claim. He made no report to the locators of these facts, nor did he explain to them the source of the $250 he was paying to each of them. It seems probable that he considered his relation as attorney in fact for them to have been closed by their signatures to the receipt and release, and that they no longer had an interest in the claim, and that subsequent events led him to reinstate his fiduciary relation and to issue to the locators each the 1,000 shares out of the 1,000,000 shares of the corporation which had taken the property over. He admitted that it was he who decided how much stock they should have. They were not consulted. Later he bought their shares from them upon payment of $250 to each.

[2] There is much to indicate that the issuance of the stock to the locators and the payment of a small dividend to them was an afterthought, which had its source in McMurtry's desire to fortify title to the claim, and to forestall adverse litigation upon the part of the government. But, assuming it to be true that he grossly abused the trust of the locators, and took advantage of them at every turn, it was after all their own affair. Such conduct on his part would not of itself render the location illegal, nor does it follow therefrom that the location was fraudulent at the time when it was made. The case should be viewed in the aspect it would have, if the suit had been brought against the locators prior to the time when McMurtry disregarded their rights and took advantage of their confidence. Nothing that McMurtry could do after that time could operate to make the location fraudulent as against them. It was substantially upon this view of the case that the court below rendered judgment, after a careful and painstaking review of all the testimony. We are not convinced that there was error in that conclusion.

The decree is affirmed.

ROSS, Circuit Judge (concurring). According to the record, McMurtry undoubtedly, in my opinion, committed a gross fraud upon those designated as the New York locators, but not against the United States. Under its laws every citizen, and every person who has declared his intention to become a citizen, is invited to explore, locate, and develop its mineral land. Therefore McMurtry was clearly authorized to ask the New York parties to become locators, and they were clearly authorized and justified in appointing him their attorney in fact to seek and locate the land in question. It is thoroughly settled

that such land can be legally located under the statute governing placer claims, not exceeding 20 acres each, and, indeed, that it can only be located thereunder; and it is also well settled that such locations may be legally made by an association of persons, that is to say, that eight competent locators may together locate 160 acres, and that so far Congress has never fixed any limit to the number of locations that may be made by the same person or persons—its policy having always been to encourage the exploration of the public lands and the discovery and development of such mineral as may be found in them. Consolidated Mut. Oil Co. v. United States, 245 Fed. 521, 522, 523, 157 C. C. A. 633. The location of the land in question by the New York parties, through McMurtry as their attorney in fact, was therefore entirely authorized and legal, and his subsequent manipulation of the property, by which he seems to have greatly profited, and to have turned over to each of his principals only $520 in cash and 1,000 shares of oil stock as their share of the venture, while a gross fraud on them, is no concern of the government as I view it.