## UNITED STATES v. THIRTY–TWO OIL CO. et al.

### (District Court, S. D. California. June 8, 1917.)

### No. A–38.

1. MINES AND MINERALS ⊂⊃36—PLACER MINES—WITHDRAWAL ORDERS.

In 1909, when oil lands were withdrawn by presidential order, there was no law for the entry and patenting of public lands containing mineral oils, except the provisions relating to placer mines, and under Rev. St. §§ 2329, 2330 (Comp. St. 1916, §§ 4628, 4629), no location of placer claims, valid against the government, could be made until the discovery of mineral. Pickett Act June 25, 1910, c. 421, 36 Stat. 847 (Comp. St. 1916, §§ 4523–4525), enacted after the withdrawal, declares that the rights of any person who at the date of any withdrawal order is a bona fide occupant or claimant of oil or gas bearing lands, and who at such date is in diligent prosecution of work leading to discovery, shall not be affected or impaired by withdrawal orders, so long as such occupant or claimant shall continue in diligent prosecution of such work. *Held* that, if the occupant or claimant was in diligent prosecution of the work at the date of the withdrawal order, and continued until discovery, his rights would not be affected or impaired by the withdrawal, and he would be entitled to the same rights in the land under the mining laws as if it had never been withdrawn.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 87.]

2. MINES AND MINERALS ⊂⊃36—PLACER MINES—WITHDRAWAL ORDERS.

Whether an occupant or claimant of oil or gas bearing land was, at the date it was withdrawn by presidential order, engaged in diligent prosecution of work leading to discovery, within the Pickett Act, is a question of fact, dependent upon the circumstances of each particular case.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 87.]

3. MINES AND MINERALS ⊂⊃36—CLAIMS—OPERATION OF CLAIMS.

Under the Pickett Act, protecting the rights of an occupant or claimant under a location on oil-bearing lands, engaged in diligent prosecution of work leading to the discovery at the date of withdrawal by presidential order, it is not necessary that the work being performed at the time of the withdrawal was on the particular claim in question; but, before it can be deemed work leading to discovery thereon, it must have been such as would reasonably tend to that end, and hence the mere drilling of a well on an adjacent claim is not sufficient, for, while it might disclose the probability of the presence of oil, it in no way would amount to discovery.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 87.]

4. MINES AND MINERALS ⊂⊃36—OIL AND GAS CLAIMS—LOCATIONS.

While in 1909, when oil-bearing public lands were withdrawn by presidential order, there was no law, state or national, which authorized or required the marking of boundaries of locations, yet the practice of

---

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

marking had grown up in oil districts, and gave the locators a preference right to possession as against all persons except the United States, which the Pickett Act was designed to protect.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 87.]

5. MINES AND MINERALS ⟨⟩36—MINING CLAIMS—DISCOVERY.

Group development or assessment work, authorized by Rev. St. §§ 2324, 2325 (Comp. St. 1916, §§ 4620, 4622), in the case of mining claims, is permissible only after discovery; and discovery work, the diligent prosecution of which was necessary to protect the rights of a claimant or occupant of oil or gas locations under the Pickett Act after withdrawal, cannot be by group.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 87.]

6. MINES AND MINERALS ⟨⟩36—MINING CLAIMS—DISCOVERY.

Under the Pickett Act, extraterritorial work, such as the building of roads, etc., for the benefit of an oil or gas location, or several locations, may constitute the prosecution of work of discovery necessary to protect the rights of claimants and locators after withdrawal of the land by the President, where such work tended to facilitate discovery.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 87.]

7. MINES AND MINERALS ⟨⟩38(4)—MINING OIL AND GAS CLAIMS—INJUNCTION.

In a suit to enjoin occupants and claimants under an oil and gas claim, who had no title, from continuing to trespass and to extract oil, marketing companies, to whom the products were sold, are not proper parties.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 88.]

In Equity. Bill by the United States against the Thirty-Two Oil Company and others. Decree for plaintiff, except as to the Thirty-Two Oil Company, J. M. McLeod, and the marketing companies, and as to them dismissed.

Frank Hall and A. E. Campbell, both of San Francisco, Cal., Sp. Asst. Attys. Gen.

Hunsaker & Britt, W. E. Mitchell, and Oscar Lawler, all of Los Angeles, Cal., Geo. E. Whitaker, of Bakersfield, Cal., and Edmund Tauszky and Pillsbury, Madison & Sutro, all of San Francisco, Cal., for defendants.

BEAN, District Judge (sitting by special assignment). The land in controversy in this suit is the northeast quarter of section 32, township 31 south, range 25 east, Mt. Diablo meridian, in the state of California. It is oil-bearing, and is included within the presidential withdrawal order of September 27, 1909. Oil had not been discovered on the property at that time, but it was occupied or claimed by sundry of the defendants, who, it is alleged, were then in diligent prosecution of work leading to discovery, and who thereafter continued such work to a discovery, and their successors in interest now claim the right to retain the possession and extract the oil therefrom under the act of Congress of June, 1910, commonly known as the Pickett Act. 36 Stat. 847.

The facts are that in January, 1907, L. B. McMurty posted a notice in the names of certain parties residing in Chicago, from whom he held powers of attorney, on each quarter of the section claiming location thereof under the placer mining laws. In October, 1908, acting as at-

torney in fact for the alleged locators, McMurty entered into a contract with Mrs. McLeod, wife of defendant J. S. McLeod, by the terms of which she was to drill a well in the exact center of the section, and if oil was discovered the alleged locators were to apply to the government for a patent for each of the four claims, and upon receipt thereof to deed to Mrs. McLeod the north half of the south half and the south half of the north half of the section. Thereafter Mrs. McLeod transferred to Messrs. Wheat, Wilson, and Gordon a three-quarter interest in the contract referred to, and there was subsequently and during the year 1908 purchased and moved onto each claim material for a derrick.

About October 1, 1908, a controversy arose between those claiming under the McMurty locators and Haberkern, Wibel, and others, who were claiming the entire section under location notices posted by them in December, 1907, which controversy was settled on October 30, 1908, by the McMurty interests surrendering and relinquishing any right they might have to the south half of the section, and the Haberkern interests doing likewise as to the north half.

McLeod, Wheat, and associates thereupon entered into a contract with the Haberkern-Wibel people for the development of the south half of the section, by which they agreed to begin drilling on the southwest quarter within 40 days, and on the southeast quarter within 4 months, and if oil was discovered, and receiver's certificate for a patent issued, they were to receive half of each claim upon which discovery had been made. The contract between the McMurty interests and Mrs. McLeod and associates, so far as it affects the north half of the section, was modified, or a new contract entered into, by which it was agreed that the amount of land they were to receive for development in case discovery was effected was confined to the south 60 acres of each quarter, in place of one-half thereof, and they were to drill for oil on each claim.

On November 7, 1908, Mrs. McLeod and associates leased to Gillette and others the east 20 acres of the south 60 acres of the northeast quarter, with an option to purchase, and on November 26th they leased the remaining 40 acres thereof and the south 60 acres of the southwest quarter by separate instruments to the California Midway Oil Company, a corporation organized by them, by the terms of which the lessee was to erect derricks and commence drilling on the property described in each lease within 60 days from November 4, 1908, and to complete at least one well thereon within one year from such date. On November 11, 1908, McLeod and associates transferred to Price and W. R. and R. H. Lacey certain alleged interests in the contracts and leases covering the south 120 acres of the north half of the section, and on December 28, 1908, the several parties, except Gillette, transferred their respective interests to the defendant Thirty-Two Oil Company, a holding corporation organized by them and in which they held the stock.

In November or December, 1908, McLeod, Wheat, and associates laid a water line from the Stratton Water Company into the section and a short distance north of the south line thereof, from which point a lateral was laid to the northwest corner of the southwest quarter, and from there to the southwest corner of the northwest quarter. Some

time in the latter part of 1908 a derrick was erected in the southwest corner of the northwest quarter by the California Midway Oil Company, and drilling commenced thereon by it in January, 1909, and continued with water through the line referred to until the well was brought in about a year later. A derrick was also erected by the same company at or near the southwest corner of the northeast quarter, which derrick was twice moved, and finally located in the northeast quarter, the property now in controversy, in February or March of 1909, but no further or other work was done on that quarter until the spring of 1910, when the derrick was rigged up and drilling commenced.

On January 1, 1909, some question having arisen as to the validity of the locations made by McMurty, in 1907, as attorney in fact for the Chicago people, McMurty attempted to relocate the north half of the section in the names of certain New York people, from whom he had powers of attorney, by posting thereon notice and recording the same. On May 17, 1909, acting as attorney in fact for the New York people, McMurty conveyed or attempted to convey the entire north half of the section to defendant McLeod in trust for the several claimants thereof, according to their respective interests, and took from him a contract which, after reciting such conveyance, and that he (McLeod) had theretofore erected derricks suitable for drilling wells on the northwest quarter and northeast quarter, and had actually commenced drilling on the northwest quarter, contained a stipulation on his part to continue drilling at the point where same was then being done until he had reached a depth of 2,500 feet or discovered oil, and within 30 days after the discovery of oil in paying quantities at such well to begin drilling on the northeast quarter at the point where the derrick was then erected, and upon discovery of oil upon either quarter to apply for patent therefor, and upon receipt of receiver's certificate to convey to the New York locators the north 100 acres thereof.

Such was the status of the property and the claims of the respective parties at the date of the withdrawal order. The defendant Buick Company and Associated Oil Company were occupying parts of the property at the time this suit was commenced, by purchase or lease from one or more of the parties subsequent to the withdrawal. The defendants Thirty-Two Oil Company and J. M. McLeod had parted with their interest in the property long prior to the commencement of the suit, and neither of them was in possession, or committing or authorizing the commission of waste, at that time. The defendant Standard Oil Company has a pipe line across the premises, and at one time purchased the oil produced from the property; but it had ceased such purchases several months prior to the commencement of the suit.

It is claimed by the government that the paper locations by McMurty in 1907 and 1909 were not made by him for the benefit of the alleged locators, but for himself and others, and were therefore a fraud on the mining law and void. I am disposed to believe there is merit in this contention. Indeed, there can be no question from the evidence but what the alleged locations made in 1909 were not for the use and benefit of the named locators, but to enable McMurty to consummate and carry out the previous contract made by him with McLeod

and others for the disposition of the property as heretofore stated. But I do not deem it necessary to put the case on that ground. If the defendants have any right to the property as against the plaintiff, it is conferred by the Pickett Act, and the facts do not bring them within the remedial provisions of that law.

[1] In considering this and similar cases, it is important to bear in mind that at the time of the withdrawal order of September, 1909, there was no law for the entry and patenting of public lands containing petroleum or mineral oil, except the provisions of the law relating to placer mines (Act Feb. 11, 1897, c. 216, 29 Stat. 526 [Comp. St. 1916, § 4635]), and that no location of a placer mining claim, valid against the government, could be made until the discovery of mineral within the limits of the claim (sections 2329, 2330, R. S. [Comp. St. 1916, §§ 4628, 4629]). Therefore an occupant or claimant of public land included within the withdrawal order, upon which no discovery had been made at the date of such order, had no legal right as against the government, prior to the Pickett Act, to continue such possession and exploration, although he was holding or claiming in good faith under paper locations and was actually engaged in the work of discovery.

No discovery had been made on the premises in controversy at the date of the withdrawal, and so we must look to the Pickett Act to determine what rights, if any, the defendants now have. The general purpose of this act was to authorize the withdrawal of public lands by the President for certain specified purposes. Large areas had, however, been previously withdrawn, particularly by the order of September 27, 1909, in the oil-bearing districts of California. It was claimed and represented to Congress that many persons and corporations were bona fide occupants or claimants of land within such withdrawn area, under paper locations, and when overtaken by the withdrawal were engaged in the work of discovery, and as a result of the withdrawal, if valid, the benefit of such work and development which fell short of discovery would be entirely lost. To save the rights and interests of such claimants or occupants against the operation of a withdrawal, Congress provided in the Pickett Act that:

"The rights of any person who at the date of any withdrawal order heretofore or hereafter made, is a bona fide occupant or claimant of oil or gas bearing lands, and who at such date, is in diligent prosecution of work leading to discovery of oil or gas, shall not be affected or impaired by such order, so long as such occupant or claimant shall continue in diligent prosecution of said work."

The rights therein conferred or confirmed are manifestly confined to bona fide occupants or claimants of public land and who were in diligent prosecution of work leading to discovery when overtaken by a withdrawal. In other words, if a bona fide operator, who had made or was holding under a location in other respects legal, except as to discovery, and on the date of withdrawal was engaged in work leading to discovery of oil or gas thereon, and he continued such work to discovery, his rights would not be affected or impaired by the withdrawal, and he would be entitled to the same rights under the mining laws as if the land had never been withdrawn. The question, then, for decision is whether the California Midway Oil Company was, on

September 27, 1909, in diligent prosecution of work leading to discovery of oil or gas on the land in controversy, within the meaning of this law.

[2, 3] Now it is clear from the testimony and in fact undisputed that there was no work in progress or immediately contemplated at the date of the withdrawal looking to discovery, or intended for the discovery, of oil thereon, and had not been for some months prior thereto, if at any time, unless the drilling of a well by the oil company on another location, half a mile distant, with the intention on its part, if oil was discovered thereon, to thereafter proceed with the development of the location in question, is held to be such work. Whether an occupant or claimant of oil or gas bearing land at the date of a withdrawal order was at that time engaged in diligent prosecution of work leading to discovery is a question of fact. No hard or fast rule applicable to all cases has or can be laid down by which it can be determined. Each case must depend to a large extent upon its own facts and circumstances. General principles only can be stated. It is not necessary that the work being performed at the time of the withdrawal was on the particular tract in question, but before it can be deemed work leading to discovery thereon it must have been such as would reasonably tend to that end, and been presently and purposely designed for that purpose. Now, the drilling of an oil well on one location would not, however long continued, lead to discovery of oil on another. It might afford evidence of the probable existence of oil on the other, and justify the expenditure of money in exploring it. Indeed, it might, by disclosing the formation, materially aid in subsequent drilling and lessen the expense. This result, however, would follow, whether the well was drilled by the occupant or claimant of the land in controversy or by a neighbor, and hence I do not think that such work on one location can be held to be work leading to discovery on another. The proviso in the Pickett Act is somewhat indefinite and uncertain, but when interpreted in the light of the known conditions and the purpose of Congress, it was intended, I take it, to confer upon those occupying or claiming in good faith at the time of withdrawal public land within a withdrawn area, with the bona fide intention of complying with the mining laws, and who were at such time in diligent prosecution of work leading to discovery thereon, the right to continue such work if discovery was subsequently made, and the right to retain possession and extract the oil, or take title by patent, the same as if the land had not been withdrawn.

[4] There was no law, state or national, at the date of the withdrawal, authorizing or requiring the marking of boundaries of a mining location or the posting or recording of notice of location prior to discovery; but a practice had grown up in the oil districts to do so, which operated by common consent as an aid in tracing the boundaries of the claim, and as constructive occupation or possession of the described area, and gave the locators or their assignees a preference right to the possession as against all persons, except the United States, while in diligent prosecution of work leading to discovery, in order that they might make discovery and a valid location. U. S. v. North American Oil Co. (D. C.) 242 Fed. 723, just decided. It was this right, existing

at time of withdrawal, Congress had in mind and intended to make valid as against the government by the provisos of the Pickett Act, within the limitations, if any, therein contained, and which it declared should not "be affected or impaired" by a presidential withdrawal. When, therefore, the occupation or claim was under such a location, the area or extent thereof should, for the purposes of the rights conferred, be determined thereby. Each location, which could not exceed 160 acres, so marked on the ground and described in the notice, should be considered as a separate unit, regardless of the number of such locations, contiguous or otherwise, occupied or claimed at the date of the withdrawal by any one person or corporation, and the work contemplated in the act is work leading to discovery on the particular location.

[5] Group improvement or development, "assessment work," or work necessary to support an application for patent, as authorized and required by Act Feb. 12, 1903, c. 548, 32 Stat. 825 (Comp. St. 1916, § 4636), and sections 2324, 2325, R. S. (Comp. St. 1916, §§ 4620, 4622), have, in my judgment, no application as such to cases of this character. They are statutory privileges accorded to and obligations imposed upon the claimants of mining land under the general mining laws after location, which must follow discovery, and have no reference to prior work. Smith v. Union Oil Co., 166 Cal. 217, 135 Pac. 966; opinion of Judge Bledsoe in U. S. v. Stockton Midway Oil Co. (D. C.) 240 Fed. 1006. Decisions construing such statutes, and especially sections 2324, 2325, are no doubt helpful on determining what will be considered work on a mining claim; but we are here dealing with the rights as defined and conferred by the Pickett Act, which was designed for relief of bona fide occupants or claimants at the date of the withdrawal, who had not but were then intending in good faith to make a discovery, and who were manifesting such intention by the diligent prosecution of work tending thereto, and not for one holding under paper locations, or locations made for the purpose of enabling one person to acquire a larger area of mineral land by one discovery than the law permitted him to take, or one who by means of skeleton derricks, cabins, so-called assessment work, or the like, was endeavoring to hold land temporarily for speculation, or until exploratory work on adjoining property owned or occupied by him, or in the vicinity, had indicated the oil or nonoil bearing quality.

[6] I have no doubt that work could have been in progress at the date of withdrawal on one of a group of locations, or even extraterritorially to any of them, which could properly be held to be work leading to discovery on all, such as the building of roads, laying of water lines, establishing camps, assembling material and equipment, and the like, if such work directly tended to and was purposely designed for the development of each location with all practical expedition. Anvil Hy. & Dr. Co. v. Code, 182 Fed. 205, 105 C. C. A. 45; Smelting Co. v. Kemp, 104 U. S. 636, 26 L. Ed. 875; Jackson v. Roby, 109 U. S. 440, 3 Sup. Ct. 301, 27 L. Ed. 990; U. S. v. Ohio Oil Co. (D. C.) 240 Fed. 996. But such is not the case in hand. Here the preliminary work had been done almost a year before the withdrawal, and was necessary and proper for the development of the

northwest quarter, and had been and was being so used. All the work being done at the time of the withdrawal or immediately contemplated was on that quarter. The work on the remaining parts of the section was suspended to await results. If it was the original purpose to develop the several locations as a unit, it was not carried out, nor was the failure to proceed with the work of discovery on the property now in controversy due to the lack of water, but to the avowed policy of the claimant, as disclosed by the testimony and by the agreement entered into, not to do so unless the result of the work on the northwest quarter proved the oil-bearing quality of the district. Mr. Kinzie, the superintendent of the properties, testified that he had no instructions to begin drilling on the northeast quarter until the fall of 1909, and that it was not the policy of his company to do so until the other well was brought in, and this purpose is evidenced by the written contract with McLeod, made in May, 1909.

[7] It follows that the government is entitled to a decree as prayed for in the bill, except as to the Thirty-Two Oil Company, McLeod, and the marketing companies. As to them, the suits should be dismissed, for the reasons given in U. S. v. Midway Northern Oil Co. (D. C.) 232 Fed. 619, and U. S. v. Brookshire Co. (D. C.) 242 Fed. 718, just decided.