UNITED STATES v. CALIFORNIA MIDWAY OIL CO. et al.

(District Court, S. D. California. June 23, 1919.)

No. B–10.

1. MINES AND MINERALS ⬭36—OIL LANDS—LOCATIONS—ABANDONMENT.
Where locations on prospective oil-bearing lands were mere paper locations, and whatever rights, if any, were acquired, lapsed or were abandoned before discovery, the property became open to relocation by any qualified person or persons.

2. MINES AND MINERALS ⬭36—OIL LANDS—LOCATIONS.
The fact that one holding powers of attorney to locate mineral claims allowed the use of the name of his principals by others did not invalidate his location of oil-bearing lands, where such location was in good faith.

3. MINES AND MINERALS ⬭36—OIL LANDS—LOCATIONS—PURCHASERS.
Where purchasers acted in utmost good faith in acquiring a locator's interest and paying therefor, without notice, knowledge, or suspicion that there was or could be any question concerning the bona fides of the location, such purchasers are not bound to presume that their vendors were wrongdoers and that the locations were invalid, and, while the bona fides of the purchase would not be a defense, that fact may be considered in a suit to set aside the locations.

4. MINES AND MINERALS ⬭14(1)—LOCATIONS—ASSOCIATION OF PERSONS.
There is no law of Congress, or regulation made in pursuance thereof, limiting the number of placer mines an individual or association of individuals can make, and Rev. St. § 2319 (Comp. St. § 4614), declares that all valuable mineral deposits in lands belonging to the United States are free and open to exploration, etc.; hence fraud or wrongdoing cannot be imputed solely because an association of individuals located a number of claims.

5. MINES AND MINERALS ⬭18—CLAIMS—LOCATION—EXTENT.
Any device whereby an association is to acquire more than 160 acres of mineral land, or an individual 20 acres, is a violation of Rev. St. §§ 2330, 2331 (Comp. St. §§ 4629, 4630), and a fraud upon the government, and locations so made are invalid.

⬭For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. FRAUD ☜50—PRESUMPTIONS.**

Fraud is never presumed, but must be established by clear, unequivocal, and convincing proof; proof which merely creates a suspicion not being enough.

**7. FRAUD ☜50—PRESUMPTIONS.**

Where circumstances proven are just as consistent with honesty and good faith as with a fraudulent intent, the inference of fraud is not warranted.

**8. MINES AND MINERALS ☜36—LOCATION—OIL LANDS—FRAUD.**

The wrongful conduct of one who located claims on oil-bearing lands under a power of attorney, which occurred after location and discovery, cannot relate back to and render the location itself fraudulent, but is admissible in evidence only in so far as it tends to show a fraudulent purpose at the time of the location.

**9. MINES AND MINERALS ☜14(2)—LOCATION—AGENTS.**

The law permits location of mining claims in the names of persons not present, who may act through an attorney in fact, and when so made all the right or title acquired by the locators may be disposed of.

**10. MINES AND MINERALS ☜36—OIL LAND—LOCATIONS.**

In a suit to cancel and set aside mineral locations on oil-bearing placer mining claims, *held*, that the original locations which were made by one acting under power of attorney were not fraudulent, nor were they fraudulently used by the attorney in fact for his own benefit, instead of his principals', and hence the locations are not open to attack by the government, having been transferred to a bona fide purchaser.

**11. MINES AND MINERALS ☜36—LOCATION—VALIDITY.**

As an abandonment of a mere paper location before discovery leaves the land open to location, *held*, that a location on oil-bearing placer mining claim should not be set aside on the ground that the location was not made for the use and benefit of the named locators, who acted through their attorney, but was made by the attorney in fact, and for the purpose of carrying out his previous contract with others relative to development of the lands, which contract was made after the attorney had located the claims in the names of other principals; it appearing the first locator's location had been abandoned.

In Equity. Bill by the United States against the California Midway Oil Company, the Associated Oil Company, and others. Bill dismissed.

We are hereby concerned with a suit brought by the United States to enjoin the continued operation by the defendants of the northwest quarter of section 32, township 31 south, range 23 east, Mt. Diablo meridian, in Kern county, Cal., as an oil-bearing placer mining claim, to cancel and set aside certain mineral locations thereon, and for an accounting for oil taken therefrom. The result depends upon the bona fides of a paper location of the property in question under the placer mining laws, made in January, 1909, in the names of H. E. Bashore, R. B. Welch, W. A. Keenan, Eugene Metz, W. A. Mahr, H. M. Walker, F. H. Romaine, and C. Rupert Walker, by L. B. McMurtry, as their attorney in fact.

McMurtry is, and for many years has been, extensively engaged in speculating in and disposing of alleged locations of prospective and undeveloped oil lands, part of the public domain in California. In 1903, while in Chicago attempting to sell stock in a company organized for the development of such locations, he became acquainted with L. A. Chadbourne and C. A. Dunbar, and at his request Chadbourne and Dunbar obtained from their friends and acquaintances four powers of attorney, each executed by eight persons, known in the record as Chicago locators, authorizing him to locate in their names mineral claims in any part of the United States, and to improve, develop, and make proof thereof, and to grant, bargain, and sell the same. McMurtry

caused these powers of attorney to be recorded in San Benito county, Cal., and acting under them posted notices of location in the names of his principals on numerous tracts of unoccupied possible oil properties in that county, which, however, were never developed or proved to be oil-bearing.

In 1906 or 1907 development in the Midway oil fields in Kern county became active, and McMurtry caused certified copies of the Chicago powers of attorney to be recorded in that county, and about January 1, 1907, posted or caused to be posted location notices in the names of the Chicago parties on sundry quarter sections of land in that district, some 26 in number, including the property involved in this suit. The several tracts described in the location notices so posted were merely prospective or hoped-for oil lands, and none of them were developed, and no discovery of oil was made on any of them until after the abandonment of the locations in January, 1909. In the fall of 1908, however, McMurtry, acting as attorney in fact for the Chicago locators, made a contract with Mrs. J. M. McLeod for the development of the property in controversy, and also the northeast quarter of the same section, upon which a location notice had been posted in the name of certain of the Chicago parties, under the terms of which Mrs. McLeod was to drill for oil on each tract, and if it proved to be oil-bearing she was to have as consideration therefor one-half thereof, the remainder to belong to the locators. A short time thereafter the contract was modified by reducing the area to accrue to Mrs. McLeod to the south 60 acres of each quarter, and her interest became vested in the California Midway Oil Company, who, some time in November or December, 1908, moved lumber and other material onto the south 60 acres of the northwest quarter of the section, preparatory to beginning active operations. Before it had commenced drilling, however, McMurtry discovered or was advised by his attorney that the locations in the names of the Chicago parties were defective, because of a mistake in some of the names, and because the notices intended to cover the north half of section 32 had not, in fact, been posted on the land described therein, owing to an error as to the boundaries. He thereupon abandoned all the locations made by him in the names of the Chicago parties, and in January, 1909, posted and caused to be recorded new notices, covering practically the same tracts, in the names of certain residents of New York, under powers of attorney executed by them in December, 1907.

These powers of attorney were obtained under the following circumstances: During the summer and fall of 1907, McMurtry had transferred his activities to New York and was engaged in selling stock in an oil company in that city. The financial panic of that year made it impossible for him to continue his operations, and in December he concluded to return to California. Before doing so, he asked associates of his by the names of Thorn, Thickens, and Powell to obtain four powers of attorney, each executed by eight qualified persons, authorizing him to locate, develop, and dispose of oil lands in their names, if he should be able to locate any such lands open to entry, on his return to California. Thickens, Thorn, and Powell thereupon approached their employés and friends, explained the matter to them, and requested the execution of such powers of attorney, assuring them that they would thereby incur no financial responsibility and there might be something in it for them. Four powers of attorney (one of which was used in making the location in suit) were thereupon executed and acknowledged, each by eight separate persons, authorizing and empowering McMurtry to locate in the names of the signers mineral claims, to develop and improve the same, and to bargain, sell, and dispose thereof. These powers of attorney were delivered to McMurtry and duly recorded in Kern county, and were used by him in posting and causing to be recorded location notices on the several tracts mentioned in this suit and other property; eight names being used for each tract. In some instances he authorized third persons to use the names of the signers to the powers of attorney in making locations for themselves.

A few days after the location in controversy in this suit, McMurtry, in the names of Bashore and others, under one of the powers of attorney referred to, agreed with the California Midway Oil Company, through its representative, J. M. McLeod, that it should proceed with the development of the property covered thereby and the northeast quarter of the section, located by him in the names of another group of the New York parties, on substantially the same

terms as the previous contract with Mrs. McLeod, as modified, but under the New York locations.

Some time thereafter, and in January, 1909, the California Midway Oil Company commenced drilling for oil on the south 60 acres of the northwest quarter and continued such work to a discovery in the summer of that year. On May 17, 1909, the New York locators, acting by McMurtry, their attorney in fact, conveyed their interest in the entire north half of the section to J. M. McLeod, subject to the outstanding contract under which the California Midway Oil Company was in possession and at work, and simultaneously therewith and as a part of the same transaction McLeod agreed in writing that, if oil should be discovered on either of the quarters, he would immediately make application for patent therefor and upon issuance of the receiver's final receipt would, by good and sufficient deed, grant, bargain, sell, and convey to the locators the north one hundred acres of each quarter. On December 3, 1909, the New York locators, by McMurtry as their attorney in fact, assigned their interest in the contract of May 17, 1909, with McLeod, to Judge Claflin, his attorney, and on the following day Claflin transferred the same to McMurtry.

Early in 1910, McMurtry, as attorney in fact for the New York locators, sold or contracted to sell the west 40 acres of the north 100 acres of the northwest quarter to the Columbus Midway Oil Company for $100,000, and received as payment thereon the sum of $10,000, and on March 22, 1911, as such attorney in fact, deeded the property to the company, taking back a mortgage to secure the payment of the balance due thereon. The Columbus Midway Oil Company subsequently made default in the payment of the balance of the purchase price, and on November 22, 1912, conveyed the property to McMurtry individually in satisfaction thereof, and the record now so stands.

In June, 1910, overtures were made by a representative of McMurtry to the Associated Oil Company to sell to it the locators' interest in the remaining 60 acres in the northwest quarter and the north 100 acres in the northeast quarter of section 32, and 1,280 acres in various other tracts covered by paper locations made by him in the name of the New York parties. Considerable negotiation and correspondence were had concerning the matter; it being agreed at one time that if the sale was consummated holders of the title would each execute declarations of trust to the effect that the title was held in trust for the original locators as evidence that they were in fact the owners of the property. This plan, however, was abandoned, and on August 4, 1910, a written contract was entered into between the New York locators, acting by McMurtry as their attorney in fact, and W. F. Herrin and others, known as the Herrin grantees, acting for the Associated Oil Company, which agreement, after stating that 16 named persons (each of whom had executed a power of attorney to McMurtry) represented that on January 1, 1909, they had legally located the northwest quarter and the northeast quarter of section 32, township 31 south, range 23 east, Mt. Diablo meridian, under the mining laws of the United States, that they were still the owners thereof, subject to the deed to and agreement with McLeod, of May 17, 1909, that a discovery of oil had been made on the northwest quarter in May, 1909, and that ever since that time they, either by themselves or their agent or representative, had diligently and continuously operated the property, to the end that discovery of oil should be made upon each and both of the quarter sections, alleged that the Thirty-Two Oil Company and McMurtry individually had an apparent interest in the property, and that McMurtry is the duly authorized, empowered, and acting attorney in fact for each and all of the 16 named persons, with a right to sell their interest in the property and make conveyance thereof. The contract then provides that, in consideration of $5,000 paid to McMurtry by the Herrin grantees, he would place in escrow deeds executed by himself as attorney in fact for each and all of the locators, conveying to the Herrin grantees all his interest in the north 100 acres of the northeast quarter, and the north 100 acres of the northwest quarter, except the west 40 acres of the latter tract, and also deeds from McLeod, the Thirty-Two Oil Company, and himself individually conveying to said grantees their interest, if any, in the property; that he would proceed forthwith to obtain from the various locators, in proper form to be recorded pursuant to the laws of California, an acknowledgment that at the date of such agreement his power of attorney was

in full force and effect, and also a ratification and confirmation by each and all of such persons of the execution of such deeds. The purchase price of the 160 acres in the north half of section 32 was to be the sum of $430,000, $175,000 of which was to be paid in cash and the balance, with interest, in production.

It was agreed that, immediately on the deeds referred to being placed in escrow by McMurtry, the oil company would deposit with the Bank of California $85,000, which should remain in escrow until the ratification and confirmation provided for should be obtained from the locators, when it and the $5,000 previously paid to McMurtry should be applied on the purchase price of the property. The remaining $85,000, with interest, was to be paid within 6 months thereafter, and in case the ratifications were not obtained the $5,000 should be returned, and the $85,000 deposited with the bank withdrawn by the oil company. The balance of $255,000 was to be paid from production at the rate of 20 cents per barrel. The contract also recites that the Associated Oil Company, as the agent of the Herrin grantees, had made and entered into contracts with McMurtry as attorney in fact for the purchase of other tracts of land located by him in the name of the New York locators, aggregating 1,280 acres, at an agreed price of $1,593.75 per acre, payable from the oil produced from such property, and it was agreed that the oil company would, immediately upon being let into the possession of the 160-acre tract in section 32, start at least one string of tools for the purpose of obtaining oil, and would continuously operate the same, barring accidents and delays, until at least one well should have been drilled upon each 10 acres thereof, providing it should be proven to be oil-bearing in paying quantities; that immediately on being let into possession of each of the other 160-acre tracts it would start at least one string of tools thereon, and continuously operate the same, barring accidents and delays, until it was determined whether it was oil-bearing or not, and that production from each tract should be applied to the purchase price thereof at the rate of 20 cents per barrel, but in case the grantees should be dispossessed by the United States, or other claimants of any of the property, it should not be responsible for the unpaid purchase price of such property or for damages on account thereof.

The deposits in escrow were made by the respective parties as provided in the contract, and the attorney for the proposed purchaser prepared a form of ratification to be executed and acknowledged by the several locators, as follows: "I, the undersigned, do hereby acknowledge that that certain power of attorney of date ———— day of December, 1907, and recorded in Book 10 of Powers of Attorney, at page 13, records of Kern county, state of California, by me together with seven others, executed to L. B. McMurtry, is and at all times since said date has been in full force and effect, and has never been revoked or modified, and I do hereby ratify, approve, and confirm that certain contract of sale made for me and in my name by L. B. McMurtry as my said attorney in fact, with W. F. Herrin et al., of date the 4th day of August, 1910, and all contracts, agreements, deeds, and conveyances made by said attorney for me and in my name, and concerning said contracts of sale and sale, and also all other contracts and transactions and acts made or done under said power of attorney by said McMurtry. Witness my hand and seal this ———— day of ————, 1910."

McMurtry thereupon went to New York and in due time obtained from all the 32 persons who had previously given him powers of attorney (except one who was dead) the execution and acknowledgment of the above ratification; the several blanks therein being filled in. It was represented to them, at the time the ratifications were requested, that McMurtry had made locations in their names under the powers of attorney given him, and had sold or contracted to sell part of the land so located in order to obtain money with which to develop the remainder, and that their share of the proceeds of such sale was the sum of $250, which was paid to each of the locators, either at the time of the signing of the ratification or subsequently thereto, by a check signed by one Scarls, but which was cashed by him upon being indorsed by the payee thereof. Upon the back of each check, and immediately above the indorsement of the payee, was the following: "Received from L. B. McMurtry $250 in full payment for all my right, title, and interest in and to the lands located by said L. B. McMurtry on my behalf in Kern county, California, pursuant to a power of attorney made by myself and others to said L. B. Mc-

Murtry, bearing date the 19th day of December, 1907." Thereafter, and in 1910, the ratifications were delivered to the Associated Oil Company, the deeds previously deposited in escrow by McMurtry withdrawn by it, the money deposited by the Oil Company paid over to McMurtry, and the sale consummated. The oil company immediately went into possession of the property, and has ever since occupied, improved, and developed the same at a very great expense.

On August 17, 1911, McMurtry caused to be organized a corporation known as the Pacific Oil Lands Company, with a capital of 1,000,000 shares, of the par value of $1 each, and himself subscribed for all of the stock except 3 shares. On September 1, 1911, acting as attorney in fact for the New York locators, he transferred to such corporation their interest in the contract of August 4, 1910, with the Associated Oil Company, and a contract with McLeod covering another section. Prior to such transfer there had been paid to McMurtry by the oil company on its contract $172,000. After the transfer of the contracts to the Pacific Oil Lands Company, the Associated Oil Company continued to deal with such corporation, and to make payment to it on such contracts and a subsequent modification thereof of date August 1, 1913, by which the company bound itself to pay $1,375,000 for the property, $75,000 in cash and the balance in payments of $20,000 a month, until the full consideration for the property of more than $1,500,000 had been paid; the last payment of $812,353.18 being made February 15, 1916, more than a year before this suit was commenced.

In 1911, before the modification of the contract, applications had been made to the local land office for patents to six or eight tracts located by McMurtry in the name of the New York locators under his power of attorney, but not included in the contract with the oil company. Early in 1912 final certificates were issued on these applications, and in one or more instances the claims passed to patent. These facts were known to the Associated Oil Company before it completed payment of the purchase price for the lands now in controversy, and were to some extent relied upon by it in agreeing to a modification of the original contract in August, 1913, and in making subsequent payments of the purchase price.

A few days after the organization of the Pacific Oil Lands Company, and on September 5, 1911, McMurtry canceled or caused to be canceled his subscription to the capital stock of the company, or a part thereof, and to be issued in lieu thereof certificates for 500,000 shares to E. A. Hoeppner, 140,000 shares to W. R. Harrison, 130,000 shares to E. W. Kay, 90,000 shares to Fred D. Hughes, and 1,000 shares to each of the 32 New York locators. The certificates of stock in favor of the locators were delivered to them some time about September, 1911, by McMurtry, or his agent; it being explained to them at that time that McMurtry had caused the organization of the Pacific Oil Lands Company for the purpose of handling the property located by him under the power of attorney, for their protection, and that such shares represented their interest therein. They were advised at the time to hold the stock, as it would prove valuable. In August, 1913, the several locators, with one or two exceptions, at the request of the secretary of the Pacific Oil Lands Company, gave to McMurtry a proxy authorizing him to represent them and vote their stock at a meeting of the stockholders of the corporation to be held in San Francisco. In December, 1913, they were advised by letter from the secretary of the Pacific Oil Lands Company that the corporation had $20,000 in cash which it wished to distribute among its stockholders as a dividend, but under the laws of California the directors could not do so without the consent of the stockholders, and inclosing a written consent to such distribution, with the request that it be signed and returned, which was done accordingly.

In January, 1914, they received from the secretary of the Oil Lands Company a check for $20 inclosed in a letter, saying that it represented their dividend as declared by the directors in pursuance of their written consent, and there was also inclosed in such letter what purported to be a copy of the first report to the stockholders of the company. In this report it stated in substance: That for a number of years prior to January, 1909, McMurtry and his associates had located and relocated some 2,880 acres of supposedly oil-bearing government land in the Midway field of Kern county, Cal. That because of lack of funds to prosecute development work on the lands McMurtry was obliged to transfer to third persons one-half, or 1,440 acres, thereof. That at great personal

sacrifice and effort on the part of McMurtry the remainder of the lands had been held and the work done necessary to preserve the possessory title up to the early part of 1910. That the situation then became desperate. McMurtry was unable to borrow money and found himself without funds to do any more work and without means of raising the money. Just at this time he fortunately made an arrangement with the Associated Oil Company by which it agreed to take over the 1,440 acres and do all work necessary to preserve the title and to pay therefor out of the oil produced from the lands, if any, at 20 cents per barrel. That the company, however, had the right to abandon any part of the land at any time and turn it back. That there were also many other onerous conditions in the agreement, which it was not necessary to detail, but was the best that could be made at the time, and was the only thing to do to save the property. That there were many people whom McMurtry felt should be beneficiaries of this agreement, the locators, the people who had given money to aid in carrying on the work of holding the lands until they were sold, those who had worked and watched, night and day, to see that hostile parties should not jump the lands, those who had labored on the land doing assessment work, and finally Mr. McMurtry himself and Mr. Hoeppner, the first of whom had conceived and carried out the plan of getting and holding the land, and the latter had done yeoman work in keeping off the trespassers and jumpers. In order that all of these people should share in the contract with the Associated Oil Company, the Pacific Oil Lands Company was formed. Its stock was divided among the various people above named, and provision made to reimburse such as were given no stock. To this company Mr. McMurtry transferred the contract with the Associated Oil Company covering the 1,440 acres of land in Kern county and 640 acres in San Benito county, and the stock of the company had gone to those who had contributed in any way to securing and holding the lands. That in the performance of the contract various difficulties presented themselves, and finally in August, 1913, a new agreement was entered into between the Oil Lands Company and the Associated Company, by which the latter agreed to pay for the 1,440 acres $1,375,000, $75,000 in hand and the balance in monthly installments of $20,000. That this contract for the first time gave the Oil Lands Company the assurance of the receipt of a definite sum for the property, and left only one contingency on which future payments could be defeated, and that was if the government should take possession of the land sold, the payment under the contract would cease, and there would be no further obligation on the part of the purchaser. That up to this time no title to any of the land sold had been obtained from the government, the Associated Oil Company simply holding possession, but it was believed that everything had been done to entitle it to a patent. However, there is always the danger of the government refusing to grant patents, in which event all our rights under the contract will cease. That the annual meeting of the stockholders was held on November 17, 1913 (same having been adjourned from August 18th), at which time McMurtry, Hoeppner, and Harrison were elected directors, and the president of the company presented a report showing receipts and disbursements from the date of the organization to August 1, 1913, as follows:

Cash received by company from production of oil under agreement with Associated Oil Company...................... $165,246.00

Disbursements:
Commissions .................................$16,524.60
Liquidation of outstanding and assumed obligations ..................................... 92,665.41
Paid to locators direct and attendant expenses of securing ratification of powers of attorney, etc... 9,991.30
Salaries, managers, secretaries, etc.............. 38,166.60
Incorporation Pacific Oil Lands Company....... 300.00
Field, office, and operating expenses............. 3,680.50
Cash on hand July 31, 1913...................... 3,917.59

The agreement with the Associated Oil Company of August, 1913, calling for payment to the Pacific Oil Lands Company of $1,375,000 constitutes the main

asset of the company. As against this there are the outstanding obligations assumed at the time of the incorporation of approximately $150,000.

Thereafter and in the spring of 1914 a representative of McMurtry called upon the several locators and stated to them that the government was attempting or threatening to regain possession of the lands involved in this contract with the Associated Oil Company; that it was necessary to concentrate all of the stock of the Pacific Oil Lands Company in McMurtry, so that he could better defend the government's action; that under the circumstances the stock was of but little, if any, value, but that McMurtry would pay each of them $250 for their stock, if they cared to take it, and, if not, they could keep their stock and take chances on the outcome. In view of these statements, each of the locators transferred his stock in blank to a representative of McMurtry and accepted the $250. This sum, together with the $250 previously paid and the $20 dividend, is all the locators ever received on account of the locations made in their names by McMurtry, and no accounting of the money received by McMurtry or the Pacific Oil Lands Company for the sale of any of the property located in their names has ever been made to them by McMurtry, or any one else, other than the report to the stockholders heretofore mentioned.

Frank Hall and C. D. Hamel, Sp. Asst. Attys. Gen., for the United States.

Henry Ach and Edmund Tauszky, both of San Francisco, Cal., for defendant Associated Oil Co.

Robert M. Pease, of Los Angeles, Cal., for defendants J. M. McLeod and Thirty-Two Oil Co.

Jordan & Brann, of San Francisco, Cal., for defendant McMurtry.

George E. Whitaker, of Bakersfield, Cal., for California Midway Oil Co.

BEAN, District Judge (sitting by special assignment, after stating the facts as above). The record is exceedingly voluminous, consisting of many thousand pages of testimony and many exhibits. There is, however, but little, if any, substantial dispute as to the controlling facts, but the parties differ widely as to the inferences and conclusions to be drawn therefrom.

[1, 2] The locations made by McMurtry under the Chicago powers of attorney and the evidence in relation thereto may, I take it, be laid aside, except in so far as it may have a bearing, if any, upon McMurtry's intention in asking for and obtaining the New York powers of attorney and making locations thereunder. None of the defendants claim under the Chicago locations, nor did the New York locators, at the time the powers of attorney were executed by them and the locations made in their names, have any notice or knowledge of the Chicago powers of attorney or McMurtry's actions thereunder, nor did they obtain such information until long after the sale of their interests, if any, had been completed and final payment made. The Chicago locations were mere paper locations, and whatever rights, if any, were acquired thereby lapsed or were abandoned before discovery. The property thereby became open to relocation by any qualified person or persons. Miller v. Chrisman, 140 Cal. 440, 73 Pac. 1083, 74 Pac. 444, 98 Am. St. Rep. 63; Bogwardt v. McKittrick Oil Co., 164 Cal. 650, 130 Pac. 417. Nor did the fact that McMurtry authorized the use of the names of New York parties by others invalidate the particular location in question, if it was in fact made in good faith.

[3] It is also clear that the defendant California Midway Oil Company and the Associated Oil Company acted in the utmost good faith, both in acquiring and purchasing the locators' interests and paying therefor, without any notice, knowledge, or suspicion that there was or could be any question about the bona fides thereof. They made their contracts concerning an interest which was apparently valid. No circumstances were disclosed, until after the full performance of the contract and the payment of the purchase price, which cast any suspicion upon the title. They were not bound to presume that their vendors were wrongdoers, and therefore make a searching inquiry as to the validity of their claim to the property, but could rightfully deal with it on the assumption that their apparent right was acquired and held in good faith. United States v. Detroit Lumber Co., 200 U. S. 321, 26 Sup. Ct. 282, 50 L. Ed. 499. And while this would not be a defense to the suit, if the location was in fact fraudulent, because they were dealing with an equity, it is a circumstance not to be lost sight of in the consideration of the case.

We proceed, therefore, to a consideration of the good faith of the New York powers of attorney, the locations made thereunder, and the subsequent action and conduct of the parties in reference thereto. The signatures to the powers of attorney were obtained principally by C. W. Thorn, Edwin L. Powell, and J. B. Thickens at the request of McMurtry. [The court at length summarized the testimony of the witnesses C. W. Thorn, Edwin L. Powell, John B. Thickens, Wm. H. Mahr, Wm. H. Keenan, Herbert M. Walker, Eugene Metz, Frank H. Romaine, C. Rubert Walker, R. B. Welch, Harry E. Bashore, J. H. McLeod, and L. B. McMurtry.]

The foregoing is a fair summary of the controlling facts in the case as admitted and shown by the evidence, as I understand them, and upon which the government makes practically three contentions: (1) That the New York locators were dummies or tools of McMurtry, and had no intention at the time they executed the powers of attorney that locations should be made for their benefit, but the powers of attorney were executed and delivered with the fraudulent purpose and intent on the part of the makers and McMurtry that they should be used in violation of the mining laws and to enable McMurtry to acquire for himself more mineral lands in one location than the laws permit. (2) That if the powers of attorney were in fact executed and delivered in good faith and for a lawful purpose they were fraudulently used by McMurtry to make the locations for his individual benefit and not for his principals. (3) That the particular location in controversy in this suit was not made for the use and benefit of the named locators, but for the California Midway Oil Company, by enabling McMurtry to carry out his previous contract with Mrs. McLeod and others, under which it claims.

[4] The first two questions may be considered together, as they are governed by the same principles. There is so far no law of Congress or regulation made in pursuance thereof limiting the number of placer mining claims an individual or association of individuals may make. On the contrary, the policy of the government seems to be to encour-

age the development of its mineral resources and to offer every facility for that purpose. To that end the law declares that all valuable mineral deposits in lands belonging to the United States are to be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase by citizens of the United States and those who have declared their intention to become such, under regulations prescribed by law and according to the local customs or rules of miners in the several mining districts so far as applicable, and not inconsistent with the laws of the United States. Rev. St. 2319 (Comp. St. § 4614). Fraud or wrongdoing, therefore, is not to be inferred or imputed in this case solely because of the number of locations made.

[5-10] The right to possess or acquire mineral lands, however, is a privilege granted by Congress, and can only be exercised within the limits prescribed in the grant. The law provides that no mining claim shall exceed 20 acres for an individual (section 2331, Rev. St. [Comp. St. § 4630]) or 160 acres for an association of eight persons (section 2330, Rev. St. [Comp. St. § 4629]). Any device, therefore, whereby one person is to acquire more than 20 acres, or an association more than 160 acres, by one location, is a violation of law, a fraud upon the government, and without legal support. United States v. Brookshire Oil Co. (D. C.) 242 Fed. 718.

It is the government's position in this case that it was the intention of the makers of the powers of attorney and of McMurtry to circumvent the law by permitting McMurtry to secure the location of more than 20 acres in one claim, and that there was, in effect, a conspiracy between McMurtry and the makers of the powers of attorney to violate the statute.

The question thus presented is one of fraud. There are certain well-settled rules to guide the court in determining such an issue. Fraud is never presumed, but must be established by clear, unequivocal, and convincing proof. Proof which merely creates suspicion is not enough. "Fraud is not presumed," says Judge Story. "It must * * * be clearly established. Suspicion is not enough. * * * The balance of the testimony is not to be nicely weighed." Sanborn v. Stetson, 21 Fed. Cas. 315. And the Supreme Court of the United States says that, "while certain circumstances will give rise to an inference of fraud, yet the law never presumes it. It devolves upon him who alleges fraud to show the same by satisfactory proof. * * * The law presumes, in the absence of evidence to the contrary, that the business transactions of every man are done in good faith and for an honest purpose; and any one who alleges that such acts are done in bad faith, or for a dishonest and fraudulent purpose, takes upon himself the business of showing the same." Jones v. Simpson, 116 U. S. 615, 6 Sup. Ct. 541, 29 L. Ed. 742. If the circumstances proven are just as consistent with honesty and good faith as with a fraudulent intent, the inference of fraud is not warranted. In short, where two inferences can be drawn from proven facts, one in favor of fair dealing and good faith and the other of a corrupt motive, it is the duty of the trier of fact to draw the inference favorable to good faith

and fair dealing. In re Hawks (D. C.) 204 Fed. 316; Ryder v. Bamberger, 172 Cal. 797, 158 Pac. 753. It is, of course, not essential that fraud be established by direct and positive proof, for that is often impossible. The circumstances proven may be sufficient to warrant a finding of fraud, but in such case the evidence must be of such a nature as to be convincing and inconsistent with the presumption of honesty.

I am of the opinion that the government has not established the fraud charged within these rules. There are certainly two inferences which can be drawn from the testimony, one of which is in favor of good faith on the part of all parties concerned at the time the powers of attorney were executed and the locations made, and that is the crucial question in the case.

The evidence of the New York locators, as well as that of McMurtry and his associates, is clear that there was no expressed understanding or agreement, at the time the powers of attorney were executed, or prior thereto, or at any time, that they should be used for McMurtry for a fraudulent purpose, or for any purpose other than to make, develop, and dispose of mining locations for the use and benefit of the locators, and in my judgment such understanding is not to be inferred from the circumstances. But few, if any, of the signers knew McMurtry by sight or had any communication with him about the matter. They executed the powers of attorney at the request of either Thorn, Thickens, or Powell, in whom they had the utmost confidence, and upon whose representations they relied in so doing. They were led to believe that McMurtry was an honest man familiar with the mining laws, and that he intended to make locations for them and in their names, if he could find property open to entry. It is true they were not familiar with the mining laws and made no particular inquiry concerning same, nor after executing the powers of attorney did they manifest any particular interest in what had been done, if anything, thereunder, but signed such papers and receipts, and accepted such sums of money as were presented and paid to them from time to time. All this may well have been because of their confidence in their principal and his associates, and reliance upon the statements and representations made to them. The fact that their confidence was misplaced does not render their acts fraudulent, and although McMurtry's conduct subsequent to the locations was not such as should have characterized the relations between a principal and his agent, he nevertheless at all times up to and for some time after the sale to the Associated Oil Company, and notwithstanding the indorsements on the checks and the other papers executed by the locators, treated them as the owners of the locations and dealt with them and the property as such. All contracts and conveyances made by him were made and executed in the name and for and on behalf of his principals. He recognized their rights or claim to the property by from time to time seeking and obtaining releases and acquittances from them, and by causing to be issued to them stock in the Pacific Oil Lands Company, the holding corporation, and obtaining their consent to the corporate meetings and distribution of dividends therein. In July, 1910, he

freely acknowledged that, notwithstanding previous conveyances made by and to him, the property was in fact held in trust by the grantees for the locators, and was willing to execute and have executed declarations to that effect.

In making the locations and subsequent contracts in reference thereto, the fair conclusion from the evidence, in my judgment, is that McMurtry was acting for and on behalf of his principals and with no intention at that time of fraudulently acquiring the land or the proceeds thereof for himself. It was not until it became apparent that a large sum of money could be realized from the transaction that his avarice or cupidity seems to have influenced him to appropriate to his own use the bulk thereof, without accounting to his principals, and in violation of his trust. Clearly his conduct after location and discovery and sale of the property, however wrongful it may be, cannot relate back to and characterize as fraudulent the execution of the powers of attorney or the locations made thereunder. Evidence in relation thereto was only admissible and can only be considered in so far as it tends to establish a fraudulent purpose at the time of the locations. United States v. Kettenbach, 208 Fed. 209, 125 C. C. A. 409. The locations were either fraudulent at the time they were made, or not at all, and it is to that question the inquiry is to be confined. The law permits locations of mining claims in the names of persons not present. Moore v. Hamerstag, 109 Cal. 122, 41 Pac. 805. When so made, all the right or title any one can acquire by the location vests in the persons located. The interest, whatever it is, thus acquired becomes theirs, to dispose of as they please. Whiting v. Straup, 17 Wyo. 1, 95 Pac. 854, 129 Am. St. Rep. 1093. When, therefore, a location was made by McMurtry in the name of his New York principals, they became immediately vested with whatever right or title such location gave, in the absence of fraud or bad faith, and such title was not changed or rendered fraudulent by the subsequent failure of McMurtry to account to them for the proceeds of the property disposed of by him under his power of attorney, or by any secret or undisclosed purpose he may have had with reference thereto. I conclude, therefore, that upon the first two points the findings must be for the defendants.

[11] Nor in my judgment is the claim that the particular location in controversy in this suit was for the benefit of the California Midway Oil Company, by enabling McMurtry to comply with his previous contract with Mrs. McLeod and others, sustained by the testimony. The same question was raised in United States v. Thirty-Two Oil Co. (D. C.) 242 Fed. 730, involving the southeast quarter of section 32. The case was decided on another point, but in the opinion it is said (242 Fed. 733) that "there can be no question from the evidence but what the alleged locations made in 1909 were not for the use and benefit of the named locators, but to enable McMurtry to consummate and carry out the provisions of a contract made by him with McLeod and others for the disposal of the property as heretofore stated." This observation was not necessary to the decision. It was, however, based upon the undisputed evidence in the then pending case, in which

McMurtry testified to the effect stated, but in the instant case his testimony is that since the trial of the former case he has verified his recollection of the matter from accessible data and that he was in error in his former testimony; that as a matter of fact the locations were not made to enable him to carry out his previous contract, but because of an intention on his part to abandon the former locations and make new ones in the name of and for his New York principals, and neither the California Midway Oil Company or McLeod or his associates knew that the land was to be relocated until after the location had been made, and in this he is corroborated in the testimony of McLeod and others.

So that upon the record as it now stands, and upon the testimony in the present case, it appears that the locations made in 1909 were for the use and benefit of the New York locators, and not for the purpose of enabling McMurtry to consummate a previous contract made by him as attorney in fact for the Chicago locators. The so-called Chicago location of the property in controversy was but a paper location. No discovery had been made thereunder, and no work done upon the property, except the moving of some material thereon by the California Midway Company, and therefore no right as against the government had vested in the locators. The property was still open to peaceable relocation, so that when McMurtry, acting as attorney in fact for the Chicago locators, abandoned their location and relocated in the name of the New York principals, the latter became, from the date of such locations, entitled to whatever rights were thus acquired, and that was the right to explore for valuable mineral deposit therein and to be protected while working towards discovery from forcible, fraudulent, surreptitious, or clandestine intrusion upon their possession. Union Oil Co. v. Smith, 249 U. S. 337, 39 Sup. Ct. 308, 63 L. Ed. 635 (March 31, 1919); Consolidated Mutual Oil et al. v. United States, 245 Fed. 524, 157 C. C. A. 633.

Bill of complaint is therefore dismissed.